**THEATRE INV. CO. et al. v. R. K. O. RADIO PICTURES, Inc., et al.**

No. 1414.

District Court, W. D. Washington, N. D.

June 19, 1947.

DuPuis & Ferguson, Ferguson, Burdell & Armstrong, W. H. Ferguson and Charles S. Burdell, all of Seattle, Wash., for plaintiffs Theatre Inv. Co. and Venetian Theatre Co.

Rummens & Griffin and Tracy E. Griffin, all of Seattle, Wash., for plaintiff Venetian Theatre Co.

Wright, Innis, Simon & Todd, Clarence R. Innis and Willard J. Wright, all of Seattle, Wash., for defendants Evergreen Theatres Corporation, Evergreen State Amusement Corporation, Cascade Theatres Corporation, and Fox Pacific Theatres, Inc.

Arthur E. Simon, of Seattle, Wash., for defendant Twentieth Century Fox Film Corporation.

Hulbert, Helsell & Paul and Frank P. Helsell, all of Seattle, Wash., for defendants R. K. O. Radio Pictures, Inc., Warner Brothers Pictures Distributing Corporation, Universal Film Exchanges, Inc., Loew's Incorporated, Paramount Film Distributing Corporation, United Artists Corporation, and Columbia Pictures Corporation.

BOWEN, District Judge.

This action was brought, for damages and injunctive relief under the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note, by plaintiffs Theatre Investment Company and the Venetian Theatre Company, owners respectively of the Bagdad and Venetian theatres in Seattle, Washington, against the above-named motion picture producers, distributors and exhibitors, charging an illegal monopoly of film distribution and supply in the Seattle area and conspiracy to so monopolize by a system of noncompetitive theatre classifications and film availability schedules and by means of uniform restrictive license agreements.

The action, a civil cause, came on for trial before a jury on October 8, 1946, and after some six weeks of trial was submitted to the jury on November 20, 1946. The jury was unable to agree and on November 22, 1946, was discharged.

The case came up for re-trial on April 22, 1947, but all the parties by their respective attorneys, with the Court's approval, arranged to submit the case to the Court without a jury for the determination of all issues on the basis of the record of the previous trial, with the assistance of additional briefs and further argument of counsel which was presented beginning June 17, 1947. On June 19, 1947, at the conclusion of the arguments, the Court rendered the following oral decisions.

The Court: * * * This case involves a number of important officials in all branches of the film industry whose activities are of great concern to the Seattle area. Some of the present national executives of the film producing and distributing

industry have had a part of their business careers in the Seattle area, and some of them, as well as some outstanding theatre operators, have been intimately connected with the business operations involved in this case.

From the evidence in this case, it obviously appears that the film industry throughout the nation is conducted, so far as distribution is concerned, upon a national basis. And that industry's activities in the several districts, divisions or areas of the industry seem to be tied in with the over-all national picture, particularly in the field of management. The occasion of Mr. Newman's becoming established in the exhibitors' field in the Seattle area seems in part to have grown out of his relationship with an important executive or important executives in the national production and distribution fields. When he first came here, I believe the evidence shows, it was not without some business connection with the defendant 20th Century Fox Film Corporation. That defendant, and its affiliates, among others, the National Theatres Company, and the National Theatres Amusement Company, have had important connections with the transactions involved in this case.

Soon after Mr. Newman arrived in the Seattle area, he embarked upon an active career in the employment of the Pacific Northwest Theatres Company which had something like forty-three or forty-four theatres in its circuit of theatre service and operation. That was in late April or early May of 1932. In December of that year that concern became bankrupt and Mr. Newman was appointed by the bankruptcy court as one of the receivers of the bankrupt estate. In an early month of the succeeding year, Mr. Newman actively participated as a competing bidder for the purchase, at a forced bankrupt sale, of some of the assets of that bankrupt estate, and as an agent or principal submitted a bid which was the successful bid for purchase of some of the theatre businesses being sold by the bankrupt estate. The prospect or realization of that acquisition by Mr. Newman for his own and associates' account inspired the organization of the Evergreen State Amusement Corporation, which

occurred in 1933; and that concern obtained from the bankrupt estate, through the assistance of Mr. Newman and his associates, the right to operate at least three downtown first-run theatres.

In the course of a reasonable time, the business of the Evergreen State Amusement Company developed under Mr. Newman's management, and within a few years—I think by the year 1935—it became, in the opinion of the principals interested in that company, advisable to merge its activities with those of the so-called John Hamrick Enterprises, including the operation of the Orpheum, the Music Hall, the Music Box and one or two other downtown Seattle theatres. That merger of theatre interests was worked out during the summer of 1935, and it was accomplished through the formation of the Cascade Theatre Company, of whose capital stock the Hamrick interests received 40 per cent and the Newman-Evergreen interests received 60 per cent.

In connection with the growth of the Evergreen Theatres Circuit, there came within that circuit's orbit the operation of the Egyptian and Neptune theatres in the University District. Before that these theatres had been under the operation of Mr. Rosenberg and he had interested with him in that operation to a substantial degree Mr. Newman and Mr. Finke.

Later, there developed some business rivalry between the so-called Sterling chain, of Seattle, dominated by Mr. John Danz, and the Evergreen Circuit, and so it was decided that there should be pooling or joint operating arrangements between some of the Sterling Theatres and the Evergreen, particularly the first-run theatres of the Sterling chain. The first of these pooling arrangements resulted in the joint operation by the Evergreen Theatres Company, a theatre-servicing company which was affiliated with Evergreen Theatres Amusement Company and other companies, whereby competition in the acquisition of film supply between the Orpheum Theatre and the Palomar Theatre was eliminated. The right to service film supply to those theatres was given by that pooling agreement to the Evergreen Theatres Company, the servicing company.

Afterwards the second of these pooling arrangements was accomplished between the Evergreen circuit and the Oak Theatre Company, owned principally by Mr. Danz or the Sterling Theatre interests, which concerned primarily the Roosevelt Theatre. That theatre by that pooling arrangement was likewise brought under a joint operations agreement under the operating policy and control of the same Evergreen Theatres Company.

As a result of these mergers and pooling arrangements, all except one of the first-run downtown Seattle theatres, so far as film supply and theatre servicing were concerned, came under the management and control of the Evergreen Theatre Company, the servicing company, which by this time had also acquired the agency for servicing all of the Evergreen group of theatres and furnishing to them their film supply. Similar arrangements had been made between the Evergreen group and National Theatres Company, an affiliate of defendant Fox. And as between the various theatres now joined in the Evergreen group, competition between the theatres themselves had been entirely displaced by the functioning of this joint operations service.

The Liberty Theatre of the Jensen-von-Herberg group remained the only first-run theatre outside of the Evergreen circuit of theatres.

The evidence convinces the court that there was during the period of 1939-1945 a sustained uniformity in the conduct of the distributing defendants respecting distribution of their film; that from year to year it took the pattern of similar license agreements negotiated by the Evergreen Theatre Company which operated under the management of Mr. Newman. Mr. Newman, apparently early in his business career in Seattle, demonstrated an outstanding business and managerial ability in the theatre operating business, and he soon obviously became a man of wide influence in that business. Oftentimes, the record discloses that when the subject of changing the run or clearance or availability of a picture at a certain theatre came up, advice was given by those connected with the transaction that Mr. Newman should be consulted. These uniform license agreements generally followed much the same pattern as to clearance, admission price, and run of the theatre to which the license was granted, and in other details not mentioned.

■ There was not proved any written contract by which alone it could be shown that an express agreement, monopolizing the trade and conspiring to do so, was entered into. But as to whether proof of such an express agreement is necessary, no better statement could be found than those statements made by the three-judge court in the case of the United States v. Paramount Pictures, D.C., 66 F.Supp. beginning at page 323, a case which respecting the issues and facts common to that case and this seems to be on all 4's with this case. Any one considering the Court's decision and the reason therefor in this case should have before him the report of that case which is sometimes referred to as the Paramount case. It is well established that conspiracies to violate the anti-trust laws involved here, as other conspiracies, may be established by evidence of the acts and conduct of the parties.

■ The price-fixing features, the conduct of the parties respecting them, and the purposes of price fixing in relation to clearances, availabilities and runs allocated to the various theatres, as disclosed by the evidence in this case, are all factual situations in all material respects similar to and of a nature like those stated in the Paramount case report beginning at page 334 of 66 F.Supp., and from a preponderance of the evidence this court so finds. For the beginning of the discussion of clearance and runs, in the Paramount case, this court refers to page 341 of 66 F.Supp. Monopolization of, and conspiracy to monopolize, price fixing, and clearance and availability allocation of photoplays by all of the named defendants have been decisively established by the evidence in this case. Granted that the purpose of such price fixing and allocation was, as stated by defendants' witnesses, to bring in the greatest amount of income and profit to the distributors, that result could not justify illegal concert in the means employed by defendants to accomplish it. Profits other-

wise unobtainable are always the principal object of monopoly and conspiracy.

▇ The court has not the slightest hesitation in finding, as the court does, upon the evidence submitted here, that from 1939 to 1945 the alleged monopoly of, and conspiracy to monopolize, the film distribution and supply involved here were effected and practiced by defendants by means of those uniform restrictive license agreements and related practices as alleged by plaintiffs in the case at bar; that thereby in the Seattle area the desired purposes of such monopoly and conspiracy were accomplished; that the distributor-defendants and the exhibitor-defendants named were parties to the monopoly and conspiracy as alleged in the amended complaint; and that all of these defendants (except Loew's, Columbia and United Artists respecting non-exonerating details) participated in the formation and practices under the alleged monopoly and conspiracy just as was found and for the same reasons as was found in the Paramount case.

The more difficult questions presented are those as to the affirmative defense and as to the amount of damages. I can not see how there can be any doubt of the existence of the great power and influence respecting all the questions of vital interest to theatre exhibitors which were exercised by the Defendant 20th Century Fox and its affiliates and agents including the Evergreen Theatre Company, the local service company. There was corporate affiliation and a close business relationship between those two companies, Intimate personal and business communication between Mr. Skouras, the President of 20th Century Fox, and Mr. Newman of the Evergreen group was maintained during the period from 1939 to 1945.

The plaintiffs during that period have not had the benefit of the film supply service and the theatres servicing furnished through the Evergreen Theatres Company which has served the Evergreen circuit of theatres. The latter group of theatres comprise an overwhelmingly large percentage of Seattle theatres, all supplied with photoplays through the agency or influence of one and the same Evergreen service organization, which is affiliated with Defendant Fox. Plaintiffs have been faced with the situation of uniform licensing agreements whereby the defendants as to the third-run category, in particular, have uniformly favored the Evergreen group and other theatres. Plaintiffs have been largely dependent upon the distributor defendants for possible film supply. Distributor defendants are among the leading, perhaps the dominant, film producers and distributors of the nation. Without defendants' product, plaintiffs could not operate their Bagdad and Venetian theatres.

The evidence offered by defendants in support of their affirmative defense that plaintiffs voluntarily participated in furthering and maintaining the alleged conspiracy must be considered in the light of the above-stated circumstances. Certain letters from plaintiffs' representative Johnson are relied upon by defendants to establish defendants' affirmative defense.

The letter written by Mr. Johnson complaining of low admission prices at the Embassy as being in violation of plaintiffs' rights under their license agreements was written many years ago. It is possible that that was written before the alleged conspiracy became effective and even before it was formed. The real beginning, I think, of plaintiffs' insistent demand for third run for the Bagdad and Venetian theatres was about the time of a letter which Mr. Newman wrote to Mr. Powers of National Theatres, a subsidiary of the 20th Century Fox organization, concerning Mr. vonHerberg's complaints about the whole system of clearances in Seattle. That was in the year 1939, long after Mr. Johnson's complaint about prices at the Embassy. Upon request from his New York affiliates, Mr. Newman in his letter to Mr. Powell went into the subject of Mr. vonHerberg's complaints at great length. It appears from Mr. Newman's letter, which was plaintiffs' Exhibit 82, that Mr. vonHerberg thought that the whole system of clearances was wrong at that time. Since that time I have found no communication in writing, from Mr. vonHerberg, wherein he manifested a different attitude. We have the oral statements of him and Mr. Johnson as to the extent of the oral demands which they made upon de-

fendants for servicing third-run pictures to the Bagdad and Venetian theatres. That testimony has been denied by a number of defendants' witnesses. The court feels that the circumstances surrounding the plaintiffs' situation, in view of the convincing proof of its having been manifested at various times in one way or another, would naturally cause one to expect that the demands concerning the subject of the proper run, clearance and availability for plaintiffs' Bagdad and Venetian theatres might have come up often. I believe there were at least two witnesses of the defendants who said that the oral demands might have been made at their offices. One of them was Mr. Smith of the Paramount organization and I believe the other was Mr. Saffle.

Mr. Johnson's letter of September 5, 1935 to Mr. Edmond of defendant Fox and Mr. Guy Navarre of United Artists, which is in evidence as plaintiffs' Exhibit 144 and as defendants' Exhibit A-15, concerning the plaintiffs' protest on the matter of developing a new fourth run downtown, the Court finds not inconsistent with plaintiffs' demands for fairer treatment by defendants because Mr. Johnson in that letter was merely saying in effect that he hoped nothing would happen that would put plaintiffs' subsequent run theatres in a worse position than they were already in. That I believe is a reasonable interpretation of that letter. The court thinks that is not sufficient to indicate that Mr. Johnson, by that action, was furthering the conspiracy.

The next letter relied upon by defendants, dated March 12, 1945 and in evidence as defendants' Exhibit A-17, was a request from Mr. Johnson on behalf of plaintiffs addressed to Mr. Drew, Seattle branch manager for defendant Fox, requesting that agreed admission prices and availability schedules, which had been omitted from the signed license agreement be inserted therein. During the trial and much of the time of my later consideration of that letter, it was difficult to see how plaintiffs could escape the contention of defendants that that letter supported defendants' charge of voluntary participation in the conspiracy by plaintiffs. After hearing the arguments of counsel on both sides, and upon final consideration of that letter, it seems to me that the meaning and effect of the letter is that as to the license contract or contracts referred to, the distributor had left out of the contract the detail as to admission prices, runs and availabilities which plaintiffs had been required to agree to or comply with respecting the pictures licensed to the plaintiffs. From the letter it is reasonable to infer that Mr. Johnson, speaking for the plaintiffs, meant in effect to say that they were going to be required to perform the contract in the details just mentioned, and, since there was a contract or contracts outstanding that were supposed to govern the rights and duties of the parties under the license agreement, which in reality specified only part of those rights and duties, that the contract should be made complete as to all these details and terms which were in reality in effect between the parties. That, in my opinion, does not spell a voluntary espousal by the plaintiff exhibitors of the program of monopoly and conspiracy alleged in the complaint. It merely manifests a desire on the plaintiffs' part that if they must be limited to the admission prices, run, clearance and availability specified orally or by the industry or by the negotiator of the license—that is, the negotiator for the distributor—that the position of the exhibitor would be more secure and would be more certainly known if all the terms were stated in the contract. In other words, if part of the contract was going to be in writing, it should all, as to all terms, be in that form.

█ In view of the observations just noted and of all the other evidence indicating that the plaintiffs were at all material times opposed to the alleged conspiracy and resisted the effect of it in so far as it related to the run, clearance and availability of films, supplied for their Bagdad and Venetian theatres, that letter, defendants' Exhibit A-17, and the other evidence relied upon by defendants fail to establish the affirmative defense. On that issue, therefore, the court finds, concludes and decides against the defendants, and further that if plaintiffs did participate in the alleged monopoly and conspiracy to monopolize, it was due to the coercion by defendants and to the business necessity of reliance upon such film supply as they could obtain from the

defendants upon defendants' terms in order that the plaintiffs might stay in business under the conditions confronting them, there being no adequate film supply other than defendants' available to them.

■ As to the action for damages, that brings the court now to the final issue between the parties; namely, whether the plaintiffs sustained damages by reason of the monopoly and conspiracy and, if so, how much in money was the amount of such damage. Here, again, the evidence is not in ideal form. It would have been easier for the court to determine that issue if there had been submitted convincing evidence to show the difference between the plaintiffs' earnings before and during the time of the damaging part of the conspiracy period. If a certain comparison of that kind could have been made, that would have been a useful one, doubtless the best. The court is of the opinion that theatre business done during the depression years from '32 to '38 is so unreliable as proof of ordinary ability to earn income that it is somewhat analogous to the situation in the Goldman case, William Goldman Theatres v. Loew's, Inc., D.C., 69 F.Supp. 103, where the damaged business was not conducted long enough before the damage period to furnish any part of a criterion to measure profits. At any rate, from neither side comes evidence convincing enough to justify the court in accepting, as the only measure of damages, the difference in the net profits of the damaged businesses in this case before and after the commencement of the realization of damages resulting from the conspiracy.

The court has to search the evidence to see if there is any other kind of proof that furnishes any other proper method. The only other plan offered in the evidence is the proposal that the court use as a yardstick the net profits of the Neptune Theatre realized during the period of the operation of the conspiracy for which damages are here sued for, and to apply that yardstick to ascertain and determine the amount of damages sustained in plaintiffs' theatre businesses, it being their contention that the Neptune is a comparable theatre. In the absence of any more convincing evidence, and in the absence of evidence convincing the court that it is improper to consider that sort of yardstick, the court will undertake to consider it under the light of all the evidence in this case touching the advantages and disadvantages of the three districts which are here by the evidence more or less brought into comparison; namely, the University District and the way in which that District affects the income of the Neptune Theatre, and the same things with respect to the Ballard District and its Bagdad Theatre and the Capitol Hill District and its Venetian Theatre. Every one who testified either said or strongly indicated that he thought the University District was the better district and had more patrons and better paying patrons for the theatre business. In some details the Ballard District, which serves the Bagdad Theatre, offers distinct advantages. I think the evidence shows that in the matter of parking available for theatre patrons the Bagdad Theatre is better serviced than any other of the three theatres or theatre districts. That is a valuable convenience.

From the evidence in this case the court finds that the University District surrounding the Neptune Theatre has more and better-paying theatre patrons than the districts surrounding the Venetian and Bagdad. That causes the court to have a very much more conservative view than plaintiffs' counsel have as to the reasonably certain or proximate damages which the Bagdad and the Venetian suffered by reason of this conspiracy during the period 1939 to 1945.

I have no doubt at all but that there is a lack of substantial competition between the Bagdad in the Ballard District and the Neptune in the University District. Also, there is very little, if any, competition between the Venetian in the South Capitol Hill District and the Neptune. I do not believe the potential patronage of any one of those three theatres is greatly affected by the element of competition among them or any of them.

A proper view of the evidence indicates there is more conflict in patronage appeal between the Venetian and the downtown theatres, than there is between the Venetian and the Neptune.

It is difficult for the court to be convinced, by the evidence here submitted, that the Venetian Theatre would ever be damaged to anything like the extent contended by counsel for the plaintiffs or that it was so damaged during the period of 1939 to '45. I have heard the evidence on both sides and I have tried to consider it as carefully as I know how but I am not convinced that the case for a large amount of damages has been sufficiently sustained by the plaintiffs in respect to the Venetian Theatre.

If the Venetian had a third run with a higher admission price than it now has, it might possibly lose to downtown first, second or fourth run theatres some of the Venetian's present patronage among Capitol Hill apartment dwellers, but from the evidence I believe it might also gain by third run at higher admission some patronage now lost by it while playing its present subsequent run. While maintaining the lowest possible admission price might be a very important policy for the Venetian, still I believe from the evidence that with a third run and accompanying price increase there would have been some added income, and that the Venetian was, like the Bagdad, in fact damaged by the monopoly and conspiracy to monopolize alleged, which the court finds existed contrary to the Sherman Act and its Amendments.

■ From a consideration of all of the evidence, both that relating to net profits of the damaged theatre businesses and that relating to the profits of the Neptune, the court finds, concludes and decides that on account of the matters alleged in the amended complaint the plaintiff, Theatre Investment Company, a corporation, owner of the Bagdad Theatre, has been damaged by the defendants and each and all of them who were served and appeared in this action in the sum of $15,000, and that such damages should be trebled as provided by statute; and that the plaintiff, Venetian Theatre Company, a corporation, owner of the Venetian Theatre, has been damaged by each and all of such defendants, on account of the matters and things alleged in the Amended Complaint, in the sum of $5,000, and that such sum should likewise be trebled; and that plaintiffs should, in addition, recover the ordinary taxable costs sustained by them in the course of this action. If there is any question about any unusual costs, the court reserves decision on that point.

I feel that before closing this oral statement of the court's decision I should say something further as to the defendants Loew's, United Artists, and Columbia.

■ As to conspiracies to violate the Sherman Act, where such a conspiracy exists and one of the conspirators does some act in furtherance of the conspiracy, not only that actor but also all the other conspirators are liable for any damages resulting from such act.

The court finds, concludes and decides that the evidence establishes that without exception each and all of these defendants, in respect to the film distributed by them and to them in the Seattle area, voluntarily conformed to the same uniform, monopolistic practices as to price fixing, and as to run and clearance and availability of film, and that each one and all of the defendants, so far as the plaintiffs' operation is concerned, were governed by the same rules and were influenced by the same considerations and the same film service supply control of the Evergreen group: that they were all equally responsible for the creation and maintenance of that monopoly and conspiracy; and that while there might be some contention as to who was the most influential or what was the most powerful influence in bringing about the monopoly and conspiracy, the fact is that both monopoly and conspiracy existed and operated with the cooperation of each and all of these defendants.

I do not believe the evidence establishes the fact that Loew's did any act as to third run which damaged these plaintiffs, but there is just as much evidence against Loew's as against any other defendant that Loew's participated generally in the formation and maintenance of the monopoly and conspiracy, although that defendant may not have specifically refused to supply to plaintiffs any pictures third-run. It is true that the Columbia was very considerate of the Liberty Theatre's first-run require-

658

ments. There can be no gainsaying that; and I think for that Columbia is to be commended. Likewise, I think that United Artists is to be commended for being fair respecting first run at the Liberty. But United Artists and Columbia were subject to and cooperated with the same film supply control as to third run as were and did all of the other defendants, and that participation of United Artists and Columbia operated to the disadvantage and damage of the Bagdad and the Venetian theatres, in my opinion.

I think that the move-over system used up available playing time of two photoplays where only one might have been required without the move-over system, thereby diminishing or delaying film for subsequent-run theatres. Move-over run was an effective part of this scheme of monopoly and conspiracy just as was found to be the case in the Paramount decision previously referred to.

The remaining request as to injunctive relief must now be considered and determined. Because all of the theatres in the Seattle area except the plaintiffs' theatres are withholding objection to the defendants' practices at this time—and for all the court knows may continue to withhold objection to defendants' practices complained of by plaintiffs—the court feels it would not be justified in dissolving the defendants' relationships and operations except in so far as their continuance may adversely affect the plaintiffs' theatres.

The plaintiffs are entitled in the court's opinion, upon the evidence and showing adduced here, to the same treatment respecting the Bagdad and the Venetian theatres which is accorded exhibitor defendants as to film service and supply to the Neptune and the Egyptian theatres.

On the question of what specific equitable relief should be granted, it is the finding, conclusion and decision of the court that an injunctive order should be and may be entered enjoining the defendants and each and all of them from withholding such like service from the Bagdad and the Venetian theatres in the future until the further order of the court.

The court does not at this time know of or what other detail of injunctive relief needs to be granted by the court in order to accomplish the purpose which the court has ruled should be accomplished.

If counsel on both sides feel there is any need of further clarification, you may make that known at this time and I will consider it. Otherwise, the court will undertake, after discussion with you as to your convenience and the court's convenience, to determine a future date appropriate for settling and entering the findings of fact, conclusions of law, judgment and decree in this case.