The FLINTKOTE COMPANY, a Corporation, Appellant,

v.

Elmer LYSFJORD and Walter R. Waldron, Doing Business as Aabeta Co., Appellees.

No. 15005.

United States Court of Appeals Ninth Circuit.

March 29, 1957.

Rehearing Denied June 3, 1957.

Harold A. Black, G. Richard Doty, Mc-Cutchen, Black, Harnagel & Greene, Los Angeles, Cal., for appellant.

Alfred C. Ackerman, Los Angeles, Cal., for appellee.

Before STEPHENS, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

Appellees as plaintiffs on July 21, 1952, filed a complaint under the Sherman Anti-Trust Act [1] against the Acoustical Contractors Association of Southern California, Inc., and certain members thereof (six individuals, and eight corporations, individuals, or partnerships do-

---

1. Title 15 U.S.C.A. § 1 et seq. (Secs. 1, 2 and 7 of Sherman Act. Secs. 4, 5, 12 and 16 of Clayton Act.) 26 Stat. 209; 50 Stat. 693.

ing business under a fictitious firm name). The Flintkote Company and four John Does were also joined as defendants. The essential interstate commerce was alleged to have been in acoustical tile.

To understand this case, it is first necessary to look at the pleadings. All defendants, other than Flintkote, were charged with violating the law in the following particulars:

"For some time prior to the date of the filing of this complaint and continuously since prior to January 1, 1951, the defendants herein, with the exception of Flintkote, well-knowing all of the foregoing facts have been engaged in a combination and conspiracy to restrain and to monopolize trade and commerce in acoustical tile in violation of * * *"

the Sherman Act. The general plan and purpose was:

"1. To maintain and adhere to non-competitive prices * * *

"2. To refrain from competing with each other * * *

"3. To allocate the sale and installation of acoustical tile among members of the defendant, The Association, * * *

"4. To exclude non-member acoustical tile contractors from their legal right to compete in the purchase, sale, and installation of acoustical tile in Los Angeles and surrounding areas by use of the following means among others:

"(a) By boycotting, threatening to boycott, and otherwise coercing manufacturers * * *

"(b) By concertedly entering inordinately low bids for jobs * * *" [Tr. 10, 11]

It was then alleged that plaintiff entered into an agreement shortly prior to January 1, 1952, to buy from Flintkote "a continuous supply of a complete line of acoustical tile;" and that:

"In or about March 1952, and solely because of the active and success-ful competition of plaintiffs with members of the defendant, The Association, and the effect of such competition on the illegal, non-competitive price fixing policies and activities of said members, the defendant Flintkote was induced to terminate its agreement to supply plaintiffs with acoustical tile products by reason and because of the concerted action and coercion exerted upon said defendant by members of the defendant, The Association, in the form of threats to boycott Flintkote products in the Los Angeles area and elsewhere in the State of California by said defendants in the event Flintkote continued supplying said products to plaintiffs." [Tr. 13, 14]

A First Amended Complaint was lodged January 28, 1953, and filed March 23, 1953, by appellees. Plaintiffs' theory of their case was changed to directly charge the defendant Flintkote Company, with agreeing to sell acoustical tile to plaintiffs in the latter part of 1951, and that "all defendants" from an unknown date "prior to the year 1951, and continuously thereafter to date of filing the complaint" conspired to restrain and have restrained trade and commerce, in violation of Sections 1 and 2 of the Sherman Act. Thus, the amended complaint charges Flintkote with being a member of the conspiracy.

In their original complaint, plaintiffs asked for $75,000 damages; that any award be trebled; for costs of suit and attorney's fees; and that defendants be enjoined from continuing any of the alleged unlawful practices.

In their amended complaint, plaintiffs asked for $100,000 damages, without any prayer for trebling the same; for costs of suit and attorney's fees; that defendants be enjoined from continuing any of the alleged unlawful practices; that the defendant Flintkote be enjoined from any agreement with other defendants to refuse to sell to plaintiffs, or in any way agreeing with other defendants, to perpetuate or assist in perpetuating the alleged conspiracies, their purposes or ob-

jects; and that Flintkote, finally, be required to

> " * * * continue said contract and agreement so long as there exists no reason under sound business principles and practices for terminating the same."

Flintkote, answering the Amended Complaint, asserted with care and verbosity common to pleadings, a general denial; alleged it had not participated in any conspiracy in restraint of trade, or to create or maintain a monopoly; set forth that it sold tile to three of the defendant's contractors, and had at times sold to three others and to plaintiffs; admitted several sales of acoustical tile to plaintiffs; alleged it made no contract with plaintiffs of any kind, nor any contract to supply plaintiffs, either on any continuing basis, or any basis, or at all.

As a first and separate defense, Flintkote alleged that it sold one carload lot to plaintiffs for resale in the San Bernardino-Riverside area (as distinguished from the Los Angeles area); that said sale was conditioned upon an understanding that plaintiffs would use the tile so sold in the San Bernardino-Riverside area, and not engage in the contracting business in the Los Angeles metropolitan area; that when plaintiffs breached said condition of sale, and contracted for installations in the Los Angeles metropolitan area, the defendant Flintkote Company refused to sell plaintiffs further tile.

This answer was filed on June 26, 1953. On July 31, 1953, a stipulation and order was entered dismissing the cause of action as to all named defendants except Flintkote. On May 4, 1955, the jury trial commenced. At the start of the trial, it was brought to the court's attention that $20,000 had been paid to the plaintiffs in exchange for a covenant not to sue, running in favor of all defendants except Flintkote. It was stipulated that the court could advise the jury

> "that a settlement of the action had been made as between the plaintiff and all defendants except the defendant Flintkote, but the Court shall not state the monetary consideration, keeping that away from the attention of the jury."

Because of this settlement, some of the jury instructions requested by plaintiffs and filed by them on April 29, 1955, in their reference to defendants, were not accurate. Before the jury was empanelled, counsel for defendant called to the court's and opposing counsel's attention, "that it would be almost imperative that plaintiffs' instructions be recast," [Tr. 155] "because in some instances we even have a situation where you tell the jury that they could find against some but not all the defendants * * *"

It was further agreed by court and counsel, before trial, that because there were both legal and equitable issues in the case, the "first were to be handled by the jury and the latter by the judge." [Tr. 158 to 161, incl.] The record does not disclose that any action, affirmative or negative, was taken on the demand for injunctive relief.

Flintkote Company now appeals from a judgment against it, based on a jury verdict for $50,000, trebled by the court to $150,000, plus $25,000 attorney's fees, plus $165.70 costs, minus the $20,000 received by plaintiff-appellees from certain original parties defendant other than appellant, or a total judgment of $155,165.-70.

Appellant urges fifteen grounds for reversal.

We believe we can best discuss these fifteen alleged errors by grouping them as follows:

*First:* The sufficiency of the evidence, (particularly as to *knowledge* by the defendant of the conspiracy, and its *participation* therein) to support a verdict of violation of the antitrust laws.

*Second:* Alleged errors in admission of evidence.

*Third:* Alleged errors in instructions, other than damages.

*Fourth:* Alleged error in refusing to grant a new trial, in instructions respecting damages, in the fixing of attorney's

fees, and in the method of crediting the $20,000 payment.

*First: The Sufficiency of the Evidence*

■ Was there any substantial evidence properly before the jury from which it could reasonably draw the conclusion on an issue of fact, that defendant Flintkote had violated the antitrust laws?

Defendant maintained its refusal to deal with plaintiff was a legitimate business decision; that it had no part in the alleged conspiracy among the original "Association defendants" to restrain trade. Hence it is urged, the Flintkote refusal to sell cannot be *participation* in a conspiracy, and Flintkote having no *knowledge* that such a conspiracy existed, could much less have *knowingly participated* therein.

"The requirement is dual," says appellant, "it requires both knowledge and participation, and neither is sufficient without the other," relying on United States v. Falcone, 1910, 311 U.S. 205, at page 210, 61 S.Ct. 204, at page 207, 85 L.Ed. 128, where the Supreme Court said:

"The gist of the offense of conspiracy * * * is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy. [Citing cases.] Those having no knowledge of the conspiracy are not conspirators [citing cases]; and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge";

and on Weniger v. United States, 9 Cir., 47 F.2d 692, at page 693 where this Court said:

"The failure of a person to prevent the carrying out of a conspiracy, even though he has the power so to do, will not make him guilty of the offense without further proof that

he has in some affirmative way consented to be a party thereto. Neither will the commission of an overt act, though unlawful in itself, be enough to show that the actor was a party to the conspiracy. The law requires proof of the common and unlawful design and the knowing participation therein of the persons charged as conspirators before a conviction is justified."

We should first recognize that the cases cited by appellant correctly state the law. We must also agree that on the question of Flintkote's knowledge as to whether the admitted conspiracy did or did not exist, all *direct* evidence is that the officers and employees of Flintkote did *not* know. That is the unvarying testimony of all defendant's employees.

■ But the problem is not that simply solved. Neither knowledge of the conspiracy alleged, nor participation therein, need be proved by *direct* evidence, even in criminal prosecutions where the rule of proof is more strict than in civil conspiracy cases, United States v. Univis Lens Co., 88 F.Supp. 809, 813. As noted by the Supreme Court in Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 297, note 4, 1 L. Ed.2d 278,

"Participation in a criminal conspiracy may be shown by circumstantial as well as direct evidence. See, e. g., Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154; Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L.Ed. 680; Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674; United States v. Manton, 2 Cir., 107 F.2d 834, 839."

It is likewise true that:

"A conviction resting solely upon circumstantial evidence is not an innovation. It is, we think, well established that the proof and evidence in an anti-trust conspiracy case is, in most cases, circumstantial. Proof of a formal agreement is unneces-

sary, and were the law otherwise such conspiracies would flourish; profit, rather than punishment, would be the reward. See American Tobacco Co. v. U. S., 6 Cir., 147 F.2d 93, affirmed 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575."

C-O-Two Fire Equipment Co. v. United States, 9 Cir. 197 F.2d 489, at page 494. And see cases cited: Wharton's Criminal Evidence, § 179, p. 354, Note 20.

■ Here the evidence before the jury showed the existence and operation of an allocation arrangement, by which acoustical jobs were assigned in rough rotation to one or another of the acoustical contractors who were members of the Acoustical Contractor's Association. There was evidence that bidders were told what to bid, not based upon what the cost of the job was, but to enable a certain contractor to get the job. Considerable time was spent in introducing and interpreting the contractor's "take off sheets," [1a] and what they meant to the workings of the conspiracy. Complimentary bidding by members of the group, other than the one designated to get the job, was engaged in. In fact, both plaintiffs had at one time worked for an employer engaged in such a conspiracy, and plaintiff Lysfjord had protested to his employer his inability to *compete* for installation jobs because of such conspiracy. There was no direct evidence that Flintkote, as a seller of tile and not an installer, participated directly in that original conspiracy between the dealers, but there was evidence from which an inference might have been drawn by the trier of fact warranting the belief that the defendant Flintkote, through acting as supplier to the conspirators on some of the jobs, could have acquired knowledge of the conspiracy; and there was evidence which warranted the conclusion that Flintkote, with such inferred knowledge, participated in the conspiracy, and aided it, by its refusal to sell to plaintiffs. If that refusal was not the result of the exercise of ordinary business judgment, but the result of threats made and pressure applied by members of the known conspiracy to and against Flintkote, the act of refusing to sell would constitute knowing participation. Because one is coerced by economic threats to participate in or aid and abet an illegal scheme does not excuse the actor.[2]

■ There was before the jury substantial inferential evidence that Flintkote had knowledge of the conspiracy, and joined it and had acted in furtherance of it, when we view the evidence in the light most favorable to the plaintiffs. The verdict of a jury will be sustained if there is substantial evidence, properly before the jury, to support it. Glasser v. United States, 1942, 315 U.S. 60, 69, 62 S.Ct. 457, 86 L.Ed. 680; Woodard Laboratories v. United States, 9 Cir., 198 F.2d 995; Las Vegas Merchants Plumbers Ass'n v. United States, 9 Cir., 210 F.2d 732, 742.

Appellant, relying primarily on Johnson v. J. H. Yost Lumber Co., 8 Cir., 117 F.2d 53, 61–62, urges that the facts of threats (assuming there were threats) will not support an inference of knowledge of a conspiracy. Such a broad statement is too general and sweeping. Proof of the fact of threats might infer knowledge, or it might not, depending on the nature of the threats, their number, their frequency, and more directly and importantly, their content and what they disclosed, directly or by inference, to the defendant Flintkote, viewed in the then existing factual situation under which they were made and received.

---

**1a.** "Take off sheets" may be defined in the acoustical tile trade as referring to written estimates of the amount of acoustical tile required for a particular project. The contractor with the lowest figure on his take-off sheet would be dropped from the bidding list and the contractor with the next lowest estimate would be instructed to take the job. [Tr. 304, 494].

**2.** United States v. Paramount Pictures, D.C., 66 F.Supp. 323, 352; approved 334 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260.

■ Where there has been proof (a) that a conspiring group of tile dealers disclosed to a supplier, directly or by inference, an accomplished unlawful purpose and intent to boycott non-participating dealers, (and hence disclosed the existence of a conspiracy) and (b) thereafter one or more dealers had threatened the supplier on numerous occasions that they intended jointly and severally to refuse to buy from the supplier if the supplier continued to sell acoustical tile to plaintiffs, and (c) if the supplier, having been selling to non-conspirators, thereafter refused to sell to non-conspiring dealers because of the threats, it cannot be maintained, as a matter of law, that such decision not to sell was a lawful exercise of the supplier's business judgment.

■ It is true that one engaged in private enterprise may select his own customers, and in the absence of an illegal agreement, may sell or refuse to sell to a customer for good cause, or for no cause whatever. But it is not for the seller to finally decide that it was for a good business reason, or no reason, that he refused to deal. That decision, placed in its proper perspective of circumstances and facts known to the seller, must be judged by the trier of facts, to determine if it was an innocent and lawful exercise of the seller's private right, or an act which showed knowing participation in an unlawful conspiracy.

Were it otherwise, there could never be a civil judgment nor any criminal conviction against any manufacturer of products flowing in interstate commerce. He could merely state—"despite my knowledge of a conspiracy which existed, which I knew to be unlawful, I'm innocent and cannot be held liable because I say I exercised my business judgment, and I can refuse to sell to anyone, and that is lawful, no matter what the circumstances may be."

Our conclusion in this matter does no violence to the Yost case. There the court says:

"From *the mere fact* of refusing to sell to plaintiffs, there can therefore arise no inference of an unlawful agreement, because one may lawfully select his own customers. [Cases cited.] There must be *substantial evidence furnishing some basis* from which the alleged fact of such an agreement may *reasonably be inferred.* A fraudulent conspiracy may be shown by circumstantial evidence, but the facts and circumstances relied upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion. Here, it appears that a number of these defendants had already refused to sell the plaintiffs even before the date of the alleged conspiracy. Others thought it had business to sell them, and as plaintiffs themselves alleged, these defendants were coerced. Where there were two dealers in the same product at the same city, it was not thought good business to sell to both plaintiffs and the other dealer. In most instances, the other dealer had been handling the products before the arrival of plaintiffs. In some cases, plaintiffs had invaded the trade territory of established dealers handling products of these suppliers, and that was at least distasteful to these defendants and there seemed to have been ample reason of a business character for the suppliers to refuse to sell to plaintiffs." (Emphasis added.)

Johnson v. J. H. Yost Lumber Co., supra, 117 F.2d at page 61.

The Yost case, relying on the Beech-Nut case [Federal Trade Comm. v. Beech-Nut Packing Co.], 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, specifically refers to *facts* which "went beyond the simple refusal to sell."

The rule of freedom of sale to anyone or no one is not absolute. Nor can it be tested in a vacuum. The Colgate case [United States v. Colgate & Co.], 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992,

"was not intended to give blanket sanction for individual discretion in refusal to deal. The Court soon

determined that its holding did not extend to protect a course of dealing which *inferentially* spelled out the factor of agreement that Colgate lacked. More important, the Court's landmark decision in Federal Trade Commission v. Beech-Nut Packing Co. places any refusal to deal in its business perspective and then against the full facts scrutinizes all pertinent antitrust prohibitions the trade pattern suggests.

Viewed in the larger business setting, even individually conceived refusals to deal may become an integral element in a violation of Section 1 of the Sherman Act * * * Also, Section 2 may forbid refusals to deal for monopolistic ends. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684."

[Report of the Attorney General's National Committee to Study the Antitrust Laws, March 21, 1955.] [3]

The decisions have placed and evaluated refusals to deal in the business setting in which they appear. While refusals to deal in themselves are legally protected, they are examined in their market context. Only thorough-going factual inquiry into the surrounding business circumstances can characterize a refusal to deal as part of a restrictive course of conduct incompatible with antitrust objectives. If we assume, therefore, that all evidence which was introduced was properly before the jury, we cannot hold as a matter of law that there was no substantial evidence from which a trier of fact could not have inferred the existence of a conspiracy, and that the defendant Flintkote knowingly participated therein. Permitting this issue to go to the jury was not error.

*Second: Alleged Errors in Admission of Evidence.*

Throughout the foregoing consideration of the first problem here presented, we have assumed all evidence before the jury was properly admitted. It is for this reason that the next point appellant raises—that evidence was erroneously admitted—must be considered most carefully. In doing so, we now reach appellant's point 2, (introduction against Flintkote of evidence of the conspiracy between the contractors); point 3, (the Waldron testimony respecting Ragland's alleged statements of alleged pressure by the conspiring dealers on Flintkote); and point 4, (the Lysfjord testimony respecting Ragland's alleged same statements). At this same time, we also will consider Krause's alleged telephone conversation with Lysfjord.

*A. Introduction as Against the Sole Defendant, Flintkote, of the Facts Relating to the Alleged Conspiracy Between the Acoustical Contractors.*

We must first consider the unique factual situation in this case. The acoustical contractors originally sued had paid, before trial, for a covenant not to sue further. This was accompanied by a dismissal. The gravamen of the amended complaint was that Flintkote had joined in an already existing conspiracy. It was therefore incumbent on plaintiffs (1) to establish the prior existence of the conspiracy; who were its supposed members; how they supposedly operated; what their conspiratorial purpose was; and how they brought about their alleged purposes; and (2) Flintkote's subsequent connection with it, before evidence of the acts or statements of alleged co-conspirators would be admissible against the defendant. Two different though not wholly unrelated problems were thus

3. It is with reluctance that the writer of this opinion makes reference to published statements for which he was, to a greater or lesser degree, partially responsible. It is comparable, but not parallel, to a judge citing a Law Review Article he had previously written, whether while on or off the bench. Yet such action has most respectable precedent and authority. For

a most recent illustration see dissenting opinion of Mr. Justice Frankfurter in Rogers v. Missouri Pacific R. Co., 352 U.S. 447, 491, 77 S.Ct. 443, 459, decided February 25, 1957. Upon occasion jurists may even revise their extra-judicial views. McGrath v. Kristensen, 340 U.S. 162, 176, 71 S.Ct. 224, 95 L. Ed. 173 (concurring opinion).

raised. One was the necessity of making a prima facie showing of Flintkote's knowing participation in the alleged conspiracy, and the other was the order of proof in which the evidence thereof would be introduced. We turn to the latter point first.

■ The rules relating to proof of a civil conspiracy take us into one of the most difficult areas of today's law. As Mr. Justice Jackson said, in his concurrence in the leading case of Krulewitch v. United States, 336 U.S. 440, at page 452, 69 S.Ct. 716, at page 723, 93 L.Ed. 790:

> "When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of the execution are admissible against all. But the order of proof in so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended, or even known about, but which help to persuade the jury of existence of the conspiracy itself. *In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed."* (Emphasis added.) [4]

We are in an area of evidentiary law where much is left to the discretion of the trial judge. The trial court has a wide discretion in the admission of evidence which even remotely tends to establish conspiracy. Clune v. United States, 159 U.S. 590, 592, 593, 16 S.Ct. 125, 40 L.Ed. 269; Devoe v. United States, 8 Cir., 103 F.2d 584, certiorari denied 308 U.S. 571, 60 S.Ct. 84, 84 L. Ed. 479; Nee v. United States, 3 Cir., 267 F. 84, 87; United States v. Sebo, 7 Cir., 101 F.2d 889, 891.

The trial court has absolute judicial discretion as to the order of proof. United States v. Manton, 2 Cir., 107 F.2d 834; United States v. Newman, 9 Cir., 156 F. 2d 8. If he believes it better to allow evidence to be introduced, subject to its being connected up at a later time, that is his prerogative and such rulings are not error.

■ That procedure is what counsel for plaintiff proposed to follow in this case, when he preliminarily offered proof of conspiracy between the acoustical contractors before he had introduced any proof of the defendant Flintkote's participation therein.[5]

---

4. Mr. Justice Jackson, because speaking in a criminal case, refers to the accused defendant. His conclusions are every bit as applicable to a defendant charged with an antitrust violation in a civil private treble damage action.

5. "Mr. Ackerson: * * * but you can always introduce evidence as to purpose and design."

"The Court: Are you contending that the yielding to 'pressure makes the one who yields a party to the conspiracy?"

"Mr. Ackerson: If he knows the illegal design, and I can prove it."

"The Court: And is that going to be your evidence of connection of this defendant to the conspiracy?"

"Mr. Ackerson: Yes, that plus other knowledge, your Honor, that they knew the design."

"The Court: What other knowledge are you going to bring home to this particular defendant? And is that going to be your evidence of connection of this defendant to the conspiracy?"

"Mr. Ackerson: Yes, that plus other knowledge, your Honor, that they knew the design."

"The Court: What other knowledge are you going to bring home to this particular defendant?"

"Mr. Ackerson: Well, this defendant, the knowledge that I have already stated, that this defendant knew the setup, he knew the effect of the setup, and when he was asked to help and obeyed and, I say, joined the setup by eliminating the only competition in the field, unless he can show that he didn't know anything about it, that he wasn't helping these contractors at all, it is my theory that he joined the conspiracy."

"The Court: The court finds that the complexities of the case now on trial

The court specifically deferred and reserved a final ruling on the admissibility of this evidence until after the plaintiffs' case was fully in; and advised counsel for the defendant his rights to move to exclude the entire line of testimony were protected.

It was not error for the court initially to invoke this "rule of convenience," as it was denominated in the courtroom. The court had very carefully and properly brought home to counsel for the plaintiffs the necessity of proving by competent evidence that Flintkote "yielded to the combine, and became a member of it." [Tr. 294]

Was competent independent evidence ever introduced?

B. *The Plaintiffs' Testimony as to Statements of Others.*

This brings us to a consideration of the alleged errors in admitting the testimony of Waldron and Lysfjord, as to the alleged statements of Ragland and others.

The only evidence that plaintiffs offered to prove defendant's "yielding," and the joining by Flintkote of the conspiracy, other than the act itself of refusing to sell, was the respective testi-

---

are such, the involvement of the alleged parties to the alleged conspiracy is such, that it is necessary to invoke the rule of convenience, as you have referred to it, Mr. Black, and to allow the evidence of acts and declarations of other alleged conspirators to be admitted into evidence, subject to a motion to strike.

"I do not know just what the outcome will be when a motion is made to dismiss at the conclusion of the plaintiffs' case, which I assume will be, on the question of joining a conspiracy because of compulsion, if the compulsion is shown to be in the form of pressure from the Association, pressure from other vendors. That would be evidence, I take it, circumstantial evidence, or offered as circumstantial evidence, of the joining of a conspiracy, but you are going to have to have enough, Mr. Ackerson, that the reasonable inference to be drawn from all the facts is that it was a yielding to the combine and becoming a member of it, otherwise we will have to, in the language of the street, throw your case out."

"Mr. Ackerson: I realize that."

"The Court: But for the present we will follow the rule of convenience and admit the testimony."

[Tr. 293, et seq.]

"The Court: As a general principle of conspiracy law, every person who is a co-conspirator of course is presumed—that is, every person who is alleged to be a co-conspirator with the person on trial as conspirators, is deemed to be their agent once he is shown to be a member of the conspiracy, and statements which are made in furtherance of the conspiracy may be admitted.

"I think the courts here have generally been admitting statements and doing so subject to a motion to strike if it does not appear that there develops a jury

question as to whether there was a conspiracy, as to whether the person who is on trial and the persons whose statements have been received, have been connected to it."

"Mr. Ackerson: I think that is right."

"The Court: Unless you have some other way you would like to handle it, I am disposed to adopt that as a policy of this case, as the other judges have done in the cases tried before them, and entertain a motion to strike if the connection is not provided by sufficient evidence to create a jury question."

"Mr. Ackerson: I don't know of any other way you can try a case like this, your Honor."

"Mr. Black: Your Honor please, it may be we are at that point where we should address ourselves to your Honor in the absence of the jury, because I think that we would like to be heard somewhat extensively on that proposition."

[Tr. 259, 260]

"The Court: Objection overruled. I will not have so many of these but what I can strike them, if it turns out to be illegal after hearing your argument, and I will hear you fully at the time the jury takes its morning recess."

"Mr. Black: Thank you."

"Mr. Ackerson: I am about through with this particular conversation. I think this is the last such conversation."

"Q. (By Mr. Ackerson): Will you relate that conversation with Mr. Ragland? * * * [Conversation related] * * *

"Mr. Black: Just a moment. I wish the record to show we move to strike this answer in pursuance of our objection."

"The Court: Ruling will be reserved until after I hear your argument." [Tr. 262, 263]

mony of Waldron and Lysfjord relating to (a) alleged admissions of Baymiller; and (b) alleged admissions of Ragland; and (c) the testimony of Lysfjord with respect to a telephone conversation directly with Krause. These alleged statements or admissions can be divided into three conversations:

6. Mr. Waldron: "Mr. Ragland said that he (Krause) came to their office—or his office and his desk, and got so abusive that he had to tell him that he would have to leave him and when he could be more rational he would return.

"Now, he was telling him that they couldn't stand for us the aabeta co., selling acoustical tile." [Tr. 262, 263]

"Q. [Asked of Mr. Lysfjord]: What about any statement to Mr. Ragland by Mr. Gustave Krause?"

"A. I don't recall that he said any more at that time. However, there was another meeting where Mr. Gustave Krause did state very violently what he thought of us going into business."

"Q. Who told you that?"

"Mr. Black: That is objected to."

"Mr. Ackerson: Yes, you may strike that."

* * * * *

"Q. (By Mr. Ackerson): Did Mr. Ragland relate this conversation to you by Mr. Krause?"

"A. Yes, sir."

"Q. Will you state what Mr. Ragland told you, what he said as nearly as you can in substance?"

"Mr. Black: It will be understood of course that our objection runs to all of this?"

"The Court: Are you speaking to the objection you urged last week?"

"Mr. Black: Yes, the objection that it is pure hearsay, that there is no authority in the agent to narrate past events."

* * * * *

"Mr. Ackerson: Will you read the question, Mr. Reporter?"

(The question referred to was read by the reporter as follows: "Q. Will you state what Mr. Ragland told you, what he said as nearly as you can in substance?")

"Mr. Ackerson: That is concerning Ragland's conversation with Mr. Krause."

"The Witness: Mr. Ragland told me that Mr. Krause came into the office and talked———"

"Q. (By Mr. Ackerson): Into the Flintkote office?

"A. Into the Flintkote office, and talked so loudly to Mr. Ragland and

*Conversation Number 1* was a hearsay statement largely made up of conclusions, by Ragland to Waldron and Lysfjord on or about February 1, 1952, at the Atlantic Avenue office of Aabeta Company covering (a) what Krause allegedly told Ragland on a previous date at the Flintkote office;[6] (b) what Howard had "compounded on the desk a little bit that Mr. Ragland got up and left and told Mr. Krause that if he couldn't talk as a gentleman he didn't want to talk to him any more, and until such time as he could behave as a gentleman, that he, Ragland, would come back and talk with him."

"Q. Did Mr. Ragland say what Mr. Krause was talking about?"

"A. He was objecting very strenuously to the aabeta company being in business."

"The Court: You cannot say he was objecting. That is a conclusion. You have to tell us what was said and then the jury can decide whether he objected to something or applauded, or something in between."

"The Witness: Well, I don't know how else to say it because that was what he was doing."

"Mr. Black: You weren't there."

"The Court: That is what he was doing? You tell us what he said. Of course you cannot remember it word for word, but you can say in substance he said, A, B, C, D, and so forth, and go ahead and relate the substance of the conversations. Then it will be up to the jury to determine whether that was an objection or not."

"The Witness: I don't know quite how to answer that."

"Q. (By Mr. Ackerson): Did Mr. Ragland—are you relating Mr. Ragland's words to you as far as the word 'objection' goes, or did Mr. Ragland say Mr. Krause used other words?"

"A. He used the word 'objected.' He said, 'I object very much to the aabeta company being in business, in competition with us, using the same type of tile.' That is why I keep saying 'objected.' That is the word he used."

"The Court: If that is the word he used, that is all right. I thought you were using a word which you thought his words added up to."

"The Witness: Oh, no. Mr. Krause very definitely said those words, as I recall what Mr. Ragland told me, that he objected very strenuously to the aabeta company. He used the words 'I object to the aabeta company being in business here

plained" to someone about, at or about that date, perhaps in the hearing of Ragland, at the Flintkote office;[7] (c) about conversations occurring at an alleged meeting of certain of the conspirators, (Krause, Howard, Newport and Lewis) wherein "boycott" was threatened by Mr. Newport, and objections were voiced by others.[8]

*Conversation Number 2* was a portion of the conversation allegedly occurring on February 19, 1952, between Ragland,

Baymiller, Thompson, Lysfjord and Waldron, when the plaintiffs were advised of Flintkote's refusal to sell further.[9]

*Conversation Number 3* was an alleged telephone call between Krause and Lysfjord occurring "after the severance" [Tr. 267], of relations between Flintkote and the plaintiffs, and after the date the conspiracy was found by the court to have ended.[10] Upon motion of defendant, this conversation was struck out [Tr. 268], but after argument, the ruling was

---

in the Los Angeles area, using the same type of acoustical tile that we are a dealer for.'

And that is the time when Mr. Ragland decided to leave, not wanting to listen to the loud conversation, and he told me it was loud. That is not my assumption. He said he didn't like it, so he left. He left for about 10 minutes as I understand it—or I was told rather—and then went back and talked further with Mr. Krause. What they talked further about, I do not know." [Tr. 475 to 480, incl.]

7. Mr. Waldron: "Yes, he (Mr. Ragland) said a Mr. R. E. Howard was down there complaining also."

"Q. (By Mr. Ackerson): And what did he say that Mr. Howard said, if anything?"

"A. I don't know any exact words, except he mentioned that they were trying their best to force ah issue to stop our operations." [Tr. 269, 270]

8. Mr. Lysfjord: "Well, Mr. Ragland came into the office, met me at the office, and mentioned that in his words, things were getting a little bit hot. He said that pressure that you were talking about is starting to show up. The competitors of yours in the field are beginning to pick up your figures and the fact that you are bidding against them around in this general area.

The manager of Howard Company, Mr. Howard, and Mr. Gustave Krause from Coast Insulating, a Sidney Lewis of Flintkote Company—I believe one of the principals there—and Mr. Newport, all had a meeting."

"Q. Who is Mr. Newport?"

"A. He is a principal of Coast Insulating. All of these are Flintkote dealers, incidentally."

"The Court: Are you telling this as a conversation?"

"The Witness: I am saying what Mr. Ragland told me."

"The Court: Very well."

"The Witness: That they had this meeting objecting very strenuously to the fact that we were in business, the aabeta company was in business.

One of the very strongest statements was from Mr. Newport, saying that he would boycott, I believe the word was, all of Flintkote's materials and see that it wasn't used in the area, and he was willing to spend $40,000 or $50,000 to do it." [Tr. 474, 475.]

"Q. (By Mr. Ackerson): Did Mr. Ragland state the conversation of Mr. R. E. Howard on this occasion?"

"A. Only that he objected very violently. I don't recall the exact words." [Tr. 476.]

9. "Mr. Waldron: * * * I asked Mr. Baymiller if they wouldn't hold up, or why they didn't hold up, to our agreement, and that I said the pressure must have been terrific. And he said, 'Yes, we had the pressure all right.'" [Tr. 257.]

Mr. Waldron, cross-examination. (Testimony from Deposition of Mr. Waldron):

"* * * I said the pressure must have been terrific from our competition to cause this to happen. He said there was pressure, and that is all he said." [Tr. 362.]

Mr. Lysfjord: "And then I believe Mr. Waldron mentioned, 'I guess the pressure started to work a little bit more than you anticipated, and that you are becoming worried about it.' * * * Mr. Baymiller stated that there was considerable pressure brought to bear." [Tr. 489, 490.]

10. Mr. Lysfjord: "He [Krause] told me he he didn't want me to feel that there was anything personal about his being chosen to front for the organization, association, which is the Contractor's Association, and their own interests; to force this termination of selling us acoustical tile." [Tr. 267.]

"recalled," apparently to be re-considered at the end of plaintiffs' case, when all defendants' motions to strike were denied.[11]

It is difficult to understand from the record precisely the theory upon which these various conversations were held admissible. At times both court and counsel talk of "res gestae," and at other times of "admissions," sometimes referring to "overt acts in furtherance of a conspiracy," at other times to the theory of "agency."

These three conversations had by plaintiffs, involve individuals in two distinguishable categories—Ragland, and Baymiller, employees of the defendant Flintkote; and Krause, an alleged "officer, director and managing director of Coast Insulating Products,[12] a California corporation," [13] one of the dismissed defendants at time of the trial.

The status of the various declarants poses distinct issues as to the admissibility of each of their statements. Requisite to the admission of incriminating statements attributed to Krause, Newport, and Ragland (in an alleged capacity other than as an agent of defendant) is a prima facie showing of Flintkote's participation in the conspiracy by competent evidence apart from the alleged statements. On the other hand, no such foundation need be laid for the alleged admissions of Baymiller and Ragland, if they were acting as agents within the scope of their employment for the defendant company.

We start with the major premise that all such statements were hearsay. In fact, when Waldron or Lysfjord told the jury what Ragland said Krause had told him, we have hearsay placed upon hearsay; and when the plaintiffs testified that Ragland told them what Krause or Newport or Howard had said at a meeting, concerning which there had been no proper foundation laid as to whether Ragland was present, we have hearsay placed upon hearsay placed upon hearsay.

It is true that there are so many exceptions to the hearsay rule that much of the evidence which decides law suits is made up of hearsay evidence. But this does not eliminate the hearsay rule as a vital and important rule of evidence, nor permit us, or the lower court, to open wide the floodgates to any evidence, in total disregard of the rule.

One of the very best reasons for the hearsay objection is to prevent the presentation of self-serving statements.[14] The instant case is a perfect example of the reason and of the necessity for the rule. Without in any way passing upon or inferring as to the credibility of witnesses who testified, we here have two of the three most interested parties to the law suit ascribing vital culpatory statements to Krause;[15] to Newport; to Howard; to Baymiller; to Thompson; to Lewis and to Ragland, each one of whom (except Newport who did not testify) denies both any recollection of the specific alleged statements, and of the fact sought to be proved by the hearsay statement.

But the hearsay rule serves another more important purpose. It requires the person asserting a fact to be present in the courtroom, and to subject himself to the best method yet devised for a deter-

11. "The Court: Considering all evidence before the court, the motions to strike are denied and the motion to dismiss is denied. Bring in the jury." [Tr. 766.]

12. Amended Complaint, ¶ 10.

13. Amended Complaint, ¶ 15.

14. "In many instances, the danger of fabrication as to whether the statement was or was not made may be as great as the danger that a statement by a declarant was a false representation of the fact stated. This, however, does not preclude admissibility as long as the statement is not used for assertive purposes."
Mason Ladd, "The Hearsay We Admit."
5 Okl.L.Rev., 271, 280.

15. Krause took the stand and denied that he had made any threats, although he readily admitted he had expressed displeasure. He claimed no right to influence or attempt to influence Flintkote; he denied he had used the word "boycott." [Tr. 1129.] The defendant's employees also denied any such statements.

mination of the truth of a fact; cross-examination.[16]

There are many exceptions taking hearsay evidence out of the general rule of inadmissibility. We will discuss the general exceptions as they relate to each conversation individually.

*Conversation Number 1:*

Ragland's alleged statements were in part a narrative of past events and in part double hearsay. In either case it was necessary in view of the fact that Ragland did not himself testify about the declarations of the alleged co-conspirators that his alleged statements came within some exception to the hearsay rule.

A number of theories exist under which the alleged statements of Ragland might have been offered against the defendant Flintkote, as exceptions to the hearsay rule: (1) As an admission of a party's authorized agent; (2) as a statement of a co-conspirator; (3) as a statement made as part of the res gestae.

Here it should be kept in mind that the evidence was never offered against the declarant Ragland individually, for he was not a party to the action.

Evidence of a hearsay statement is admissible against a party to the action if the judge finds: (a) the declarant was authorized by the party to make a statement for him concerning the subject matter of the statement; or (b) the party, with knowledge of the content of the statement by words or conduct manifested his adoption or approval of the statement or his belief in its truth.[17]

Here there was no attempt to prove that Flintkote adopted or approved of Ragland's statement as to what Krause, Howard and Newport had said, as to alleged threats. Hence plaintiff was left with the possibility of showing that Ragland had authority to make alleged statements purporting to establish the threats.

No evidence was offered to establish direct written or oral authority. Plainly, counsel relied on an implied or inferred authority from Flintkote to Ragland, to make the statements described by Waldron and Lysfjord. Technically, we believe such a reliance takes the hearsay declaration out of the "authorized declaration" class of exception to the hearsay rule, into the *"vicarious admission"* rule.

16. As one writer has said:
"The protection of the jury from being misled surely is a factor to be considered if a statement made out of court is to be regarded as intrinsically weak, subject to a cover for fraud, or containing the possibilities of error or mistake caused by bias, failure to understand, or the imperfection of memory. However, the hearsay rule applies in equity as well as in jury trials. Therefore these reasons alone, formidable as they appear, are not always sufficient to justify the exclusion of hearsay evidence. Professor Wigmore, in his thorough analysis of the hearsay rule of exclusion, concludes that the rule exists because of the lack of opportunity to cross-examine the declarant of a perceived fact as a testing process in the attempt to discover the truth. If the witness is a person who has personal knowledge, he may be examined as to the accuracy of his perception, memory, words of communication, and his sincerity or truthfulness. This is in line with the distinction between a deposition and an affidavit; or under the former the truth-testing device of cross-examina-

tion has been made available. Professor Morgan includes all of the reasons expressed above when he states:
'Hearsay is excluded because of potential infirmities with respect to the observation, memory, narration and veracity of him who utters the offered words when not under oath and subject to cross-examination.'

He also regards the hearsay rule of exclusion as now being directed more towards protecting the adversary than towards safeguarding the triers of fact, although both are so interrelated that it is hard to consider the effects separately. The rule at least rests in the hands of the adversary because, unless objection is urged, hearsay evidence will be admitted for consideration by the triers of fact."
"The Hearsay We Admit." Professor Mason Ladd 5 Okl.L.Rev., 271, 272.

17. American Law Institute, Model Code of Evidence, Rule 507; Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, 128, 23 A.L.R.2d 1349; United States v. United Shoe Machinery Corp., D.C., 89 F.Supp. 349, 351.

That rule has been expressed as follows:

> "Evidence of a hearsay declaration is admissible against a party to the action if the judge finds (a) the declaration concerned a matter within the scope of an agency or employment of the declarant for the party and was made before the termination of the agency or employment, or (b) the party and the declarant were participants in a plan to commit ⁙ ⁙ a civil wrong, and the hearsay declaration was material to the plan or its subject matter and was made while the plan was in existence and before its execution was complete ⁙ ⁙ ⁙ "[18]

Subdivision (b) presents no very difficult problem. The alleged conspiracy did not, either as pleaded, or as the case was tried, attempt to charge or make Flintkote's employee, Ragland, a member of the alleged conspiracy,[19] or a "participant" who "planned" to commit a civil wrong. Subdivision (b) is really an extension of the usual rules applicable to conspiracies, and the admissibility of admissions made by a co-conspirator.[20]

We think Wigmore hits the nail on the head when he observes that our problem is one of the law of agency, not of the law of evidence.

> "He who sets another person to do an act in his stead as *agent* is chargeable in substantive law by such acts as are done under that authority; so too, properly enough, admissions made by an agent *in the course of exercizing that authority* have the same testimonial value to discredit the party's present claim as if stated by the party himself.
>
> "*The question therefore turns upon the scope of the authority. This question, frequently enough a difficult one depends upon the doctrine of Agency applied to the circumstances of the case, and not upon any rule of evidence.*" (Emphasis added.)

IV Wigmore on Evidence 3rd Ed., § 1078.

Let us examine the record to see what was Ragland's capacity with Flintkote. Ragland left the employ of the Flintkote Company on April 1, 1955.[21] He had started that employment February 1, 1951. He had started as a field service engineer, "to promote the general line of insulation board products, which had no connection with acoustical tile." On June 1st, 1951, he "was given the job of sales promotion for acoustical tile, in which position he remained." Ragland *had worked with the two plaintiffs previously, and was friendly with them. They met socially on frequent occasions,*

---

18. Model Code of Evidence, rule 508. In connection with subdivision (a), see Peoples Gas Co. of Kentucky, Inc., v. Fitzgerald, 6 Cir., 188 F.2d 198; State Farm Mut. Auto Insur. Co. v. Porter, 9 Cir., 186 F.2d 834; American Ins. Union v. Lowry, 5 Cir., 62 F.2d 209; Sharples Separator Co. v. Skinner, 9 Cir., 251 F. 25. The decisions propounding the rule set forth in subdivision (b) are legion. See e. g. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 388 S.Ct. 65, 62 L.Ed. 260.

19. While there were statements in colloquy between counsel and the court indicating that plaintiffs relied on the proposition that all employees of defendant Flintkote were agents and co-conspirators [Tr. 259], it cannot be seriously urged that naming a corporate defendant a co-conspirator makes every employee of said corporation a co-conspirator, subject to the rules of evidence which relate to a conspiracy.

20. In commenting on it, for example, American Law Institute's Model Code of Evidence points out that subdivision (b) does not accept the rule as generally stated with reference to declarations of co-conspirators, which require the alleged statement to *further* the conspiracy, not merely be *material* to it. "The tendency in the authorities is to receive evidence of all declarations of a conspirator concerning the conspiracy when made during its pendency." We do not here pass on the question of whether a declaration which does not tend to further the objects of the conspiracy is admissible.

21. Hence, the witness Ragland was not employed by defendant Flintkote during the trial of this action.

and Ragland wanted to help them become representatives of Flintkote, if he could.

Ragland, as "promotional salesman," worked under an assistant sales-manager, of the Southwest Division, of the Pioneer Division, of The Flintkote Company, a Mr. Browning Baymiller. Baymiller's immediate superior was a Mr. E. F. Thompson, Sales Manager. Thompson's immediate superior was Mr. Frank S. Harkins, who "had charge of all activities of the building material division."

The determination of whether or not Flintkote was to contract with the plaintiffs was passed "upwards" seriatim by Ragland to Baymiller to Thompson to Harkins. Ragland had no executive duties for the corporate defendant, but was a representative at the lower echelon.

There was an utter lack of proof of or any questioning seeking to establish Ragland's authority to speak on behalf of Flintkote, concerning the alleged incriminating statements of Krause, Howard, and Newport, threatening Flintkote with a boycott.

We must yet consider the admissibility of such hearsay statements under the *res gestae* exception. Wigmore has this to say:

> "In two departments of substantive law this use of 'res gestae' has been very common, namely in the law determining liability for the acts of an agent and for the acts of a co-conspirator. The acts and admissions of an agent are available to charge the principal when they occurred in the course of his employment; and of a co-conspirator, when they occurred in the duration of the conspiracy. It is often attempted to designate this course of action, which thus limits the range of chargeable acts as 'res gestae.' But the scope of it is to be ascertained wholly from the substantive law on those topics, not from any rule of evidence."

VI Wigmore on Evidence 3rd Ed., § 1769.

> "The phrase 'res gestae' has long been not only entirely useless, but even positively harmful. It is useless, because every rule of Evidence to which it has ever been applied exists as a part of some other well established principle and can be explained in terms of that principle. It is harmful * * * (and) ought therefore wholly to be repudiated, as a vicious element in our legal phraseology."

VI Wigmore on Evidence, p. 182.

We conclude that if the alleged admission in Conversation Number 1 is not admissible as a statement of a co-conspirator or of a party's authorized agent, it is not admissible under any theory; i. e., it does not fall within the legitimate and accepted *res gestae* exceptions of Spontaneous Exclamations, Verbal Acts, or Statements of a Mental Condition.

VI Wigmore on Evidence, 3rd Ed., § 1768.

▮ We cannot pass on whom the jury could, or should believe, but we have the duty of seeing that any evidence, ordinarily inadmissible as hearsay, is admitted into evidence for the jury to consider only when a proper foundation for its admission has been laid.

The discussion of both counsel throughout the trial recognized the responsibility resting in the trial court. The trial court recognized it. But when this complicated case went to trial (without the usual pre-trial conferences), the court was pressed for immediate answers on involved procedural and evidentiary points. We conclude the court erred (a) in permitting the introduction of this hearsay evidence (Conversation Number 1, supra) without any foundation showing the extent and scope of the authority resting in the employee Ragland, if any, to act for and bind the corporate defendant; and (b) in refusing to grant the defendant's motion to strike, made at the conclusion of the plaintiffs' case, relating to the same "vicarious admissions" allegedly made by the witness Ragland.

What was the effect of the erroneous admission of this evidence?

Here we have testimony introduced which goes to the very heart of plaintiffs' cause of action and to defendant's defense. Why did Flintkote terminate the contract? No reason was placed in writing. The only evidence (other than the bare refusal to sell, which was equivocal) were the conversations. Of these a reading of the record persuasively demonstrates that Ragland's alleged statements were by far the most significant and the most damaging to defendant's cause. They spelled out in clear perspective the nature of the conspiracy and brought the events home to the jury with the dramatic and incisive impact that only admissions can produce. This was defendant's own former employee outlining the unlawful scheme. The full effect of this evidence on the jurors' minds cannot be measured with precision. To deny that it influenced the jury's verdict in a material manner is to ignore reality. What the verdict would have been had this evidence not been introduced is not certain. Moreover, it is not our function to decide a hypothetical case. We must rule only on the basis of what actually transpired in the court below and under the circumstances here presented we hold that the admission of Ragland's statement constituted prejudicial error.

*Conversation Number 2:*

■ The statement attributed to Baymiller (Conversation Number 2, supra) again tenders the question of agency. Baymiller may or may not have been an executive officer of defendant company, authorized to bind that company by his statements. He was Ragland's immediate superior. His position, and his activity in connection with the subject matter of this action justified the admission of his alleged statement for whatever probative value it may have had, provided that a proper foundation had been laid. We need not pass upon that issue here; nor upon the question of what the jury might have decided if this testimony was properly admitted,

and the inadmissible Conversation Number 1 excluded.

*Conversation Number 3:*

■ Conversation Number 3 involves no question of agency, for Krause was neither agent, servant nor employee of the defendant Flintkote. Krause was named as a co-conspirator in the amended complaint. [¶ 10, Tr. 20.] Thus if plaintiff had made a prima facie showing that there was a conspiracy and that Flintkote had joined the conspiracy, then the statements made by a co-conspirator, if made *during the existence of the conspiracy,* and *in execution of the common design,* were admissible against all conspirators. Schine Chain Theatres v. United States, 334 U.S. 110, 117, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. United States Gypsum Co., 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746.

■ This conversation was introduced for the purpose of establishing that the act of termination was not equivocal, that it was an act in furtherance of the conspiracy, and that Flintkote had joined in that conspiracy. Excluding the evidence improperly introduced, no sufficient basis for the introduction of Conversation Number 3 was proved. Thus the foundation required to make the evidence admissible could only be established by the evidence itself. While much latitude is allowed in the order of proof establishing a conspiracy (as we have hereinabove discussed) the proponent of the evidence must still lay a proper foundation.

It may seem anomalous that the proponent must establish the existence of the conspiracy by independent evidence before statements of alleged co-conspirators showing the existence and operations of the conspiracy is admissible. A cynic might observe that the law requires that the body be buried before the coffin is nailed. But the law has its reasons. The only conceivable basis upon which the admission of such unsworn and damaging evidence can be justified—the parties acted in concert and each authorized or approved the

other's actions—intrinsically necessitates an independent showing of the conspiracy. If the rule were otherwise, persons would go to jail or be held liable in damages solely on hearsay evidence which they had no opportunity to impeach or refute.

There is a further reason why, under the record as it existed before the trial court, and the manner and theory under which the case was tried, this Conversation Number 3 was inadmissible. The court had previously ruled (and we do not here pass upon the merits of that ruling) that the refusal of Flintkote to deal further with plaintiffs on February 19, 1952, marked the termination of the conspiracy.[22] If that be true, the statements of Krause were inadmissible against Flintkote, the alleged co-conspirator.[23]

*Third: Alleged Errors in Instructions, Other Than Damages.*

We next consider the defendant's third ground of alleged error, relating to instructions. Specification 12, alleged error in instructions respecting damages, will be considered later. There remains specification of alleged errors (Appellant's Points 5 to 10 inclusive) in instructions with regard to: Flintkote's participation in the conspiracy; reasonableness of restraint of trade; conflicting instructions on injury to public; refusal to give defendant's instructions 24, 25, and 33; error in refusal of defendant's instructions on burden of proof (Defendant's 14 and 42).

We have heretofore pointed out that the plaintiffs' instructions in this case were prepared for a trial against all named defendants, including those dismissed out prior to trial, and that counsel for both parties and the court had agreed that they should be re-cast. Unfortunately, such re-casting did not take place in every instruction. The court did carefully and properly instruct the jury:

"* * * but there is only one defendant here. This complaint * * * was filed against many defendants. What has happened in this case with respect to the others is not of any concern to you. We are trying the case here today as to this one defendant."

[Tr. 1239]

The court further charged that:

"The Flintkote Company can be liable for refusing to sell acoustical tile to plaintiffs only if such refusal to sell was in furtherance of and as a consequence of a knowing participation in an unlawful combination or conspiracy."

22. "The Court: * * * Now I haven't heard anything yet which would indicate a court's duty to depart from the rule that admissions of a conspirator, one conspirator made in the course of a conspiracy and in furtherance of it, are admissible against and binding upon the fellow-conspirators. The rule I refer to is the one that holds that in order to be in furtherance of a conspiracy, the act or declaration must be one which was made in the course of the conspiracy and not afterwards. I think that the date of the conspiracy ended as the closing date for the making of admissible admissions binding on other conspirators—it is certainly binding upon the person who makes them—but as to their being in furtherance of a conspiracy they can't very well further it after it is ended. And I think if your February 19, 1952 date of ending is the date which forecloses the admissions of persons other than the firm on trial and its own direct agents acting for it rather than acting for it as a conspirator————"

"Mr. Ackerson: Very well, your Honor."

"The Court: ————so if you have some holding of a court on that express question, I will reopen the ruling, but unless you do have, I will not admit testimony of the type just alluded to."

"Mr. Ackerson: Statements or acts subsequent to the termination date of the conspiracy, February 19th?"

"The Court: Yes. That statements or acts of persons other than the defendant on trial, and its agents, that is, the agents of Flintkote, Flintkote a corporation rather than Flintkote a conspiracy."

"Mr. Ackerson: Yes." [Tr. 293, 294, 295.]

23. Krulewitch v. United States, supra; Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196.

In other words, we come back to the old principle that if the Flintkote Company was acting entirely on its own, without conspiracy with the other defendants, then there is no cause of action."

[Tr. 1247] [See also, Tr. 1252]

This charge was essentially correct.

But the jury was also instructed as follows:

"* * * However, the case here is one in which The Flintkote Company is accused of being a member of a conspiracy. The Flintkote Company or anyone else engaged in private enterprise may select its own customers, and in the absence of an illegal contract, combination or conspiracy may sell or refuse to sell to any person, including these plaintiffs, for any cause or for no cause whatever. *But under the antitrust laws it cannot do so if there has been a conspiracy.*" [Tr. 1236] [Emphasis added]

Without interpretation this is an inaccurate expression of the law. It permits a recovery against a defendant who refuses to deal "if there has been a conspiracy;" *irrespective of whether or not the defendant then sought to be held participated therein.* Plaintiffs can only urge that it might be *inferred* that because of the first sentence (de-emphasized in Appellant's Brief), there was impliedly added to the last sentence the words: "in which Flintkote participated."

▆▆▆ The confusion thus created was compounded by another instruction:

"If you are satisfied from all the evidence that any two or more of the defendants acted together for the purpose and with the effect of eliminating the competition in the purchase, sale or installation of acoustical tile, then you may return a verdict against the defendants and in favor of the plaintiffs, provided the evidence actually shows preponderantly that plaintiffs were damaged by such acts and conduct." [Tr. 1245, 1246.]

Here the jury was authorized to return a verdict against the defendant *irrespective of whether or not the defendant ever participated in the conspiracy!* This goes to the heart of the defendant's theory of defense.

Finally, the jury was instructed that if they found certain essential facts existed, then

"* * * your verdict should be in favor of plaintiffs as to each defendant whom you find to have knowingly participated therein." [Tr. 1245.]

And again, if they were satisfied that certain acts took place,

"* * * then you may return a verdict against the defendants." [Tr. 1245.]

The given instructions were misleading and contradictory. They did not help the jury return a careful and thoughtful verdict. The instructions were not correct, and should not have been submitted nor read. However, defendant admits that no objection was made to these instructions at the time they were given, [Tr. 1257–1261] or before the jury retired. There thus exists the question as to whether defendant can take advantage, on this appeal, of the alleged error. Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A.

We recognize the fact that trial lawyers in some respects act at their peril, in requesting a revision of an instruction once it has been given to a jury. It may be unduly emphasized in the jury's mind. Nevertheless, if the instruction is erroneous, objection must be made, and as the rule says, "stating distinctly the matter to which he objects and the grounds of his objection."

When a party fails to do this, he runs the risk that despite the error, he may be held to have waived it.

Because of other prejudicial error, to which exception was properly taken, we need not here pause to re-consider the

question of whether "plain error" in the giving of misleading instructions may be reviewed where no proper objection or exception was made at the trial.[24]

Neither was any specific objection made to the court's failure to give certain instructions requested by the defendant, (No. 24, 25, 26, 27, 28, 29, 30, 32 and 33). The court admittedly gave the substance of some of these. The trial court has a broad discretion in the emphasis it may direct to any legal position, or whether, after having spoken on the subject, it need or need not repeat the proposition in varying ways, as proposed by respective counsel. We believe the court clearly tried to fairly present both plaintiffs' and defendant's legal theories to the jury; and we hold that on this aspect of the case, he did so.

As to burden of proof, we agree with the trial court that many instructions were offered, that he selected one, and "did not wish," nor was he required, to repeat. No error was committed thereby.

*Fourth: Alleged Error in Refusing to Grant a New Trial; in Instructions Relative to Damages; in Fixing Attorney's Fees; and in Crediting the $20,000 Payment.*

We now turn to defendant's fourth contention, concerning damages. Here there is no question but that the defendant objected, and took exception, to the theory of damages which went to the jury, and which governed the court's action thereafter.

Appellant contends that numerous errors were committed in respect to the ultimate amount of the judgment. Specifically, appellant asserts (A) the jury verdict was grossly excessive; (B) damages were awarded for a period of time beyond the permissible period; (C) the District Judge erred in determining the legal effect of the covenant not to sue executed between appellees and others;

and (D) the attorney's fees granted below and those sought on appeal are excessive. We will consider these points in order.

A. *Excessive Damages.*

At the outset appellees question this Court's power to review the denial of a new trial on the grounds of excessive damages. Regardless of what the rule may be in other circuits, this Court has repeatedly affirmed its authority to review such a denial. Cobb v. Lepisto, 9 Cir., 6 F.2d 128; Dept. of Water & Power of City of Los Angeles v. Anderson, 9 Cir., 95 F.2d 577, certiorari denied 305 U.S. 607, 59 S.Ct. 67, 83 L.Ed 386; Southern Pacific Co. v. Guthrie, 9 Cir., 180 F.2d 295; Id., 9 Cir., 186 F.2d 926, certiorari denied 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343. And it may reverse the lower court's decision if it finds the verdict grossly excessive or monstrous. Southern Pacific Co. v. Guthrie, 9 Cir., 186 F.2d 295. Stated differently, however, appellant's contentions in the instant case actually challenge the sufficiency of the evidence to support the jury verdict, a question of law, and one which this Court or any appellate court of ordinary jurisdiction has undoubted power to decide.

Appellees here sought damages for three separate and distinct kinds of injury to their business:

(1) Out-of-pocket expenses incurred in establishing a business in San Bernardino. These expenses consisted of sums expended for building rental, promotion and advertising, and trucking and utilities. Without dispute, they totaled $1,920.00. If we assume liability proven, the evidence supports without question an award as to this amount.

(2) Out-of-pocket expenses resulting from the increased cost of acoustical tile caused by appellees' inability to purchase their supplies from Flintkote. Appellees introduced evidence tending to show that during the period

24. Persons v. Gerlinger Carrier Co., 9 Cir., 227 F.2d 337; Woodworker's Tool Works v. Byrne, 9 Cir., 191 F.2d 667; Lynch v. Oregon Lumber Co., 9 Cir., 108 F.2d 283.

from January 1, 1952 to May 3, 1955, they paid $87,808.97 for acoustical tile obtained from persons other than Flintkote and that this represented an excess of $12,758.57 over that sum which Flintkote would have charged them for the equivalent quantity. The evidence on this point was conflicting and although it appears possible that some of the items included in the computation of the aggregate amount actually paid were not properly allocable to acoustical tile, that was a question for the jury's determination. Excepting the question as to the validity of the time period for which damages were here allowed, which we will later come to, no error appears in the record as to this theory of damages.

(3) Loss-of-profits which appellees would have realized had they been able to acquire acoustical tile from Flintkote on a direct basis. The total possible damages sustained under items (1) and (2) is $14,678.57. Thus it is obvious that most of the award was based on loss-of-profits, and it is here that the evidence is frailest.

Initially, it should be noted that damages for all three kinds of injury alleged in the instant case are recoverable in the same action, if supported by competent evidence, and not all nor any two are necessarily mutually exclusive. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

Turning to the issue of lost profits, the sole evidence adduced relative thereto was the oral testimony of the plaintiffs and their accountant, as supplemented by written computations. [Plaintiffs' Exhibits 38 and 39.] An analysis of the qualifications of the witnesses as well as the testimony is essential to an understanding of the problem which confronts us.

Mr. Lysfjord testified that prior to the formation of the aabeta company, he had worked twelve years in the acoustical tile industry, which were evenly divided between installing and selling, the last five of which were spent as a salesman for the R. W. Downer Co. He stated that he "never concerned" himself with the financial position of that company and "had nothing whatever to do with the purchasing of materials" for it. In short, his activities were restricted to the sales facet of this business. He evidently was thoroughly acquainted with this part of the business, but it is apparent from his own testimony that he knew little, if anything, about the myriad problems entailed in the proprietary and managerial operations of an acoustical tile business. That Mr. Lysfjord was an able and experienced salesman is not disputed. That is one thing. That this record qualifies him as an expert on business prognosis is quite another matter. His testimony bespeaks of great optimism, predicated not so much on economic reality as on his personal philosophy and enthusiasm.

"I can't see any reason in my mind that I shouldn't be able to do as well for myself as working for somebody else. I surely would work as hard or probably twice as hard for myself as for anybody else." [Tr. 628.]

His partner, Mr. Waldron, demonstrated the same fervent hopes. His experience, too, had been confined to work as an applicator and then as a salesman before he embarked on this venture. Further, he admitted that he had had no previous experience in operating or owning any business; that in regard to his work at the R. W. Downer Co., he had never acquired any knowledge of its working capital or financial structure and, indeed, had never even examined its books. Despite this patent lack of business background, he testified that he fully anticipated annual profit increases, justifying his assumption on

"Just normal expected increase in good will and sales, promotional work, * * *" [Tr. 711.]

The accountant, Mr. Frank Hamiel, merely performed the mechanical func-

tion of computing the figures given him by plaintiffs.

What, then, were plaintiffs' estimates and upon what factual basis were they grounded? In essence, the computation of lost profits was based on the assumption that the plaintiffs would make as much working for themselves in their first year of operation as they and their employer, R. W. Downer Co., made together from their sales in their best year working for that going concern; that thereafter, profits would increase as much as 50% annually. In other words, they thought that they could have sold a carload of acoustical tile per month in 1952; one and one-half carloads per month in 1953; and two carloads per month in 1954. The gross sales price of a carload was estimated at $18,000, with a 20% net profit or $3600 per carload. The 20% profit factor was derived from adding plaintiffs' 10% commissions to the 10% profit made by the Downer Co. on their sales. Thus, the total net profit for each partner was approximated at $21,600 in 1952; $32,400 in 1953; and $43,200 in 1954, for a cumulative total of $97,200 each, from which actual earnings were deducted to leave a net loss of anticipated profits of $75,788.50. It was also shown that plaintiffs actually made a net profit of 5% of gross sales in 1952; 11% in 1953; and 5% in 1954. (This variance alone is of peculiar significance to the soundness of plaintiffs' theory of damages.)

The foregoing represents the sum and substance of plaintiffs' evidence on this issue. The omissions are manifold and significant. Nowhere in the record is there any substantial evidence of the state of the industry during this three year period. There is no evidence that plaintiffs would probably have obtained more business if they could have purchased Flintkote tile on a direct basis in that no showing is made of the existence or availability of such business or plaintiffs' ability to undertake additional work. We know only that business was "very competitive" and that plaintiffs encountered difficulty in disposing of the one and one-half carloads of Flintkote tile which had been supplied them. Financially, plaintiffs went into business with a relatively small capital investment ($6,000), with hopes of increasing their capital account by plowing profits back into the enterprise.

A study of the adjudicated cases in this area readily dispels any impression that this question of damages is governed by an application of the common law rule of reasonable certainty. The cases have long since departed from this rule in antitrust litigation. Story Parchment Co. v. Paterson, supra, 282 U.S. at page 565, 51 S.Ct. 248. Just how far they have gone in imposing the risk of uncertainty on defendants we must now consider.

Preliminarily, it should be observed that the reasons underlying the evolutionary trend toward liberality in proving damages are grounded in logic and sound policy. Two principal factors have influenced the courts. First, the self-evident intangible nature of the subject matter. To ascertain what would have been is as difficult as trying to determine what should be. In the cryptic words of Judge Wyzanski, in a private antitrust action, "You can't go to a book and look for the answer." Cape Cod Food Products v. National Cranberry Ass'n, D.C., 119 F.Supp. 900, 910. Second, the legal maxim that a wrongdoer should not profit by his wrong. In light of the intrinsic uncertainty surrounding this problem, the responsibility for which lies in large measure with the defendant found liable, it has long been felt that this presents an ideal situation for application of that doctrine.

As stated by the Supreme Court,

"* * * a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."

Eastman Kodak Co. of New York v. Southern Photo Material Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684. Cf. Story Parchment Co. v. Paterson Parchment Paper Co., supra, 282 U.S. at page 563, 51 S.Ct. 248; Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed. 652. It is in this setting that the modern rule has developed.

We take it that the controlling rule today in seeking damages for loss of profits in antitrust cases is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue. Once that has been accomplished, the jury will be permitted to "make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." Bigelow v. RKO Radio Pictures, Inc., supra, 327 U.S. at page 264, 66 S.Ct. at page 580. The cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the *fact* of injury must first be shown before the jury is allowed to estimate the *amount* of damage.

The Supreme Court articulated this dichotomy of damage proof in the Story Parchment Co. case.

"It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."

282 U.S. 555, 562, 51 S.Ct. 248, 250. Cf. Bigelow v. RKO Radio Pictures, Inc., supra.

Although there may be instances where this distinction does not advance the resolution of a particular controversy, it here serves a useful purpose in accentuating the paucity of evidence of lost profits.

There are three chief types of evidence which the decisions have approved as the basis for the award of damages. (1) Business records of the plaintiff or his predecessor before the conspiracy arose.[25] (2) Business records of comparative but unrestrained enterprises during the particular period in question.[26] (3) Expert opinion based on items (1) or (2).[27]

In all three important Supreme Court decisions in this field, the jury verdict was sustained on the basis of evidence of prior business success by either the plaintiff or his predecessor.[28] There is, of course, no previous business history of a comparable nature in the case at bar. The absence of such history is not

25. Frey & Son v. Welch Grape Juice Co., 4 Cir., 240 F. 114; William H. Rankin Co. v. Associated Bill Posters, etc., 2 Cir., 42 F.2d 152.

26. William Goldman Theatres v. Loew's, 69 Fed.Supp. 103, affirmed 3 Cir., 164 F.2d 1021, certiorari denied 334 U.S. 811, 68 S.Ct. 1061, 92 L.Ed. 1742; Bordonaro Bros. Theatres v. Paramount Pictures, 2 Cir., 203 F.2d 676; Milwaukee Towne Corp. v. Loew's, 7 Cir., 190 F.2d 561; Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, certiorari denied 343 U.S. 942, 72

S.Ct. 1035, 96 L.Ed. 1348; Theatre Investment Co. v. RKO Radio Pictures, Inc., D.C., 72 F.Supp. 650.

27. Frey & Son v. Welch Grape Juice Co., supra; William H. Rankin Co. v. Associated Bill Posters, supra; Bordonaro Bros. Theatres v. Paramount Pictures, supra.

28. Eastman Kodak Co. v. Southern Photo Material Co., supra; Story Parchment Co. v. Paterson Parchment Paper Co., supra; Bigelow v. RKO Radio Pictures, Inc., supra.

fatal, for even total exclusion from business is actionable, if substantial evidence of damages be adduced.[29] Here, though, plaintiffs did endeavor to introduce a type of prior business history. That is, they sought to show by their past performance with the Downer Co. what their expected profits would likely be in a new business. However, all they showed was evidence of their highest commissions during an unspecified period and what the company's profits on their sales had been. They selected only their segment of the business. There is no evidence of the over-all records of Downer Co.; nor evidence whether the company prospered as a whole; or whether it took more or less profit on plaintiffs' sales to compensate for gains or losses in other parts of the business. Further, there is no evidence of size of the Downer Company, or its financial resources as compared to that of the Aabeta Company. Indeed, plaintiffs conceded that they knew little about the affairs of the Downer Company.

Though the Supreme Court expressly withheld ruling on the validity of comparative figures in the Bigelow case,[30] subsequent lower court decisions in the motion picture cases have accepted them where similarities were shown.[31] Where no basis for comparison was shown such evidence has been rejected.[32]

Here no attempt whatsoever was made to introduce comparative figures of other acoustical tile businesses during the period in issue. The record is devoid of any evidence of what any other similar business did during any period. The references to the Downer Company business are fragmentary. There is no evidence of what established firms made during the period in question or what

newly-formed companies made in their formative years during any period.

We have only the plaintiffs' own estimate. Yet their own testimony discloses their total lack of managerial experience and their lack of knowledge of the financial operations of an acoustical tile business.

The decision in William H. Rankin Co. v. Associated Bill Posters, supra, relied upon by appellees, does not support their position, for as explained by Judge Chase in Baush Mach. Tool Co. v. Aluminum Co. of America, 2 Cir., 79 F.2d 217, 227, the Rankin decision (which he also authored),

"* * * upheld the admission of an estimate of lost profits, but there was a proper basis for estimate in that case afforded by a period of profitable operation prior to the defendants' unlawful interference which prevented a continuance of the former success."

In the Baush case itself, the court held inadmissible the testimony of plaintiff's president estimating future profits.[33]

We have reviewed the cases most favorable to appellees, but we have been unable to discover any case so fraught with uncertainty as the one at bar, which upholds a jury verdict. This Court only recently cautioned against giving "judicial blessing to a decision based upon speculation, surmise, and conjecture." Wolfe v. National Lead Co., 9 Cir., 225 F.2d 427, 434. There the District Court's dismissal of an action because of failure of proof of injury was affirmed.

We recognize the fact that as we examine this feature of the case, injured plaintiffs and a wrongdoing defendant face the court. In such a context the

29. William Goldman Theatres v. Loew's, supra.

30. 327 U.S. at page 266, 66 S.Ct. at page 580.

31. See Twentieth Century-Fox Film Corp. v Brookside Theatre Corp., supra.

32. Wolfe v. National Lead Co., 9 Cir., 225 F.2d 427.

33. Cf. Chiplets, Inc., v. June Dairy Products Co., D.C., 114 F.Supp. 129, holding conclusionary estimates of claimant's officers insufficient evidence upon which to ground judgment for alleged loss of profits.

record will not ordinarily be searched with a microscopic eye. Yet something better is required to sustain a jury verdict than a mere interested guess.

As stated by the Supreme Court in Bigelow v. RKO Radio Pictures Inc., supra,

"In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork."

Where, as here, the sole evidence as to loss of profits is the testimony of the plaintiffs, both inexperienced in business operations, stating what they had expected to make during the infancy of a newly-created enterprise based on inaccurate computations [34] of the most money they had made working as salesmen for an established firm in years preceding those in question, with no attempt having been made to establish a comparison as to either the businesses or the years, the jury verdict predicated on such evidence cannot stand.

We do not hold nor imply that a jury verdict could not be upheld under any circumstances solely on the testimony of the plaintiffs. We hold only that if they are qualified to make these estimates, the record must show their competency and the factual basis upon which they rest their conclusions.

B. *The Period of Time for Which Damages Were Recoverable.*

The court below, over strenuous objection, admitted evidence and instructed the jury that it could award damages for injuries incurred up to the date the trial began. Appellant urges that the proper cut-off date is the day the action was filed. The original complaint was filed on July 21, 1952. The amended complaint was filed on March 23, 1953. The trial commenced on May 4, 1955. No special verdict was rendered apportioning the damages to any particular segment of time. Thus, it is apparent that this question permeates the entire damage award in a substantial manner and if error be found, it is perforce prejudicial.

■ Two well-settled propositions of law govern the determination of this issue. Succinctly stated, they are, that a plaintiff is entitled to recover all damages for injuries proximately caused by wrongful acts committed *prior* to the filing of the action;[35] and conversely, a plaintiff is not entitled to recover damages for injuries resulting from wrongful acts committed *subsequent* to the filing of the action.[36] The time of the wrongful act controls the measure of damages. Thus, it becomes necessary to ascertain whether plaintiffs' injuries were caused by a prior act or whether they are attributable to protracted conduct and repetitive acts which continued beyond the date this action was filed.

■ It is appellees' position that there was only one wrongful act in the instant case, i. e., "the act of terminating permanently appellees' source of supply" on February 19, 1952. It is

34. The computations of plaintiffs' average monthly 1951 earnings with the Downer Co.—the base figure in all their tabulations—are patently incorrect and distorted. They reflect not only commissions earned during the base year, 1951, but also include undisclosed sums earned in 1950, but not paid until 1951. For example, Lysfjord's purported average monthly earnings were $1,580.00. This figure was arrived at by adding the *total* amount he received during 1951, $12,739.85 to that received in 1952 for sales made in 1951, $6,221.00. That sum was then divided by twelve. It would appear basic

that if there was some time lag between sales and compensation therefor, if the 1950 sales were to be included in the aggregate figure for 1951, then the 1952 sales should be excluded. But this was not done. Both were included on the rationalization that an accurate allocation among the particular years could not be made. This made for a basic inaccuracy of at least 50%.

35. Lawlor v. Loewe, 235 U.S. 522, 35 S. Ct. 170, 59 L.Ed. 341.

36. 25 C.J.S., Damages, § 193, p. 908.

true that Mr. Thompson's declaration made that day that Flintkote would no longer sell to plaintiffs was the only overt act of the alleged conspiracy charged against the defendant now sought to be held. Thereafter, say appellees, a continued refusal to sell in execution of the conspiracy could be implied from the already manifested refusal. Appellees' argument contains an inherent dilemma. If their position be that the February, 1952, announcement marked the termination of the alleged conspiracy, then any subsequent refusal to sell, express or implied, would be a lawful act and not actionable. If, on the other hand, we were to assume that the conspiracy did not end on that day, we would have to infer a continued refusal to sell; otherwise, plaintiffs could not succeed, for the record fails to show any attempt made by plaintiffs after February 19, 1952, to purchase acoustical tile from Flintkote.

Appellees' characterization of the refusal on February 19, 1952, as a *"permanent"* and fixed act is a mere conclusion, and more important, incorrect. In the very nature of things, the announcement lacked finality. It could mean no more than that Flintkote, on that day, was absolutely and unalterably opposed to future dealings with the plaintiffs. Appellees confuse unequivocality with permanency. Flintkote's position was neither irrevocable nor immutable. It was under no legal duty to adhere to that position. On the contrary, it was at all times completely free to reconsider and modify its views.

This cause of action is founded on an act of a continuing nature. The express refusal to deal constituted no more than a refusal to deal at that time. Plaintiffs' injuries were not caused just by the announced refusal but rather resulted from the explicit refusal coupled with the implied persistence in the announced course of conduct. Indeed, appellees themselves recognized the continuing nature of the conspiracy for in their brief they assert that:

"At the time of trial it is clear that appellees * * * were still under the competitive limitations resulting from the conspiracy."
[Appellees' Brief, p. 108]

"[A] conspiracy * * * is in effect renewed during each day of its continuance." United States v. Borden Co., 308 U.S. 188, 202, 60 S.Ct. 182, 190, 84 L.Ed. 181. Accordingly,

"Each time the plaintiff's interest is invaded by an act of the defendants, he has a new cause of action. For that particular invasion he is at once entitled to recover as damages, not only for the injuries he suffers at once, but also for those he will suffer in the future from that particular invasion, including what he has suffered during and will suffer after the trial. Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341. But he can not at once recover for anticipated invasions, even though they are of the same general character of as those he has already sustained." Momand v. Universal Film Exchange, D.C., 43 F.Supp. 996, 1006.

A case almost on all fours with the instant case is Connecticut Importing Co. v. Frankfort Distilleries, 2 Cir., 101 F.2d 79, which also involved a private antitrust action under the Sherman Act. There the plaintiff, a distributor, alleged a conspiracy between defendants, other distributors and the manufacturer, Frankfort, to maintain fixed prices; its refusal to join the conspiracy; and the consequent refusal by Frankfort to supply plaintiff with Frankfort products. The trial judge restricted damages to those sustained before the action was brought and on appeal the Second Circuit, addressing itself to the precise question before this Court, held,

"Neither do we find any error on the plaintiff's appeal. The recoverable damages were only those sustained by the plaintiff from the time the cause of action accrued up to the time the suit was brought. Frey

& Son, Inc., v. Cudahy Packing Co., D.C., 243 F. 205. Damages which accrue after the suit is brought cannot be recovered in the action unless they are the result of acts done before the suit was commenced. Lawlor v. Loewe, 235 U.S. 522–536, 35 S.Ct. 170, 59 L.Ed. 341. Here the plaintiff's damages, if any, after the commencement of the suit were due to continued refusal or refusals, in furtherance of the conspiracy, to supply it with the Frankfort products after that time. The unlawful acts which would give rise to such damages had from their nature to be committed in carrying out the conspiracy after the suit was brought. It would be impossible to predict how long such a conspiracy would remain in existence or how long the refusal to sell to the plaintiff would continue and, even if such damages could, in a sense, be treated as the result of refusing to supply before suit was brought, they would be purely speculative."

101 F.2d at page 81.

In Frey & Son v. Cudahy Packing Co., supra, where the identical question was again in issue, the Court stated [243 F. 206]:

"In this case the only damage proved by the plaintiff was the loss of profits it would have made on resales of Old Dutch Cleanser, if it had been able to buy Old Dutch Cleanser at the price at which other jobbers could obtain it. Such damage is a damage which occurs from day to day, and the damage on one day is not the necessary result of an act done by the defendant at an earlier date."

Cf. Savannah Theatre Co. v. Lucas & Jenkins, 8 F.R.Serv. 34.12, Case 2 (S.D. Ga.1944).

The decision cited by appellees, Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., supra, is not contrary. In that case defendants' unlawful practices compelled plaintiff to sell its theatre business to a corporation controlled by the defendants. Among its assets was a fifteen year leasehold interest in the theatre. The court held that the jury could properly consider evidence of the theatre's profits during that period, although they accrued after commencement of the action, as one factor in determining the extent of injuries suffered by plaintiff as the result of the wrongful deprivation of its right to continue business.

The Brookside case is illustrative of the very distinction between the past and recurring act situations; that action for the destruction of plaintiff's business is analogous to an ordinary tort claim for a broken arm. In such instances, the causes of the plaintiff's injury have ceased to exist; only the effects remain. Here, though, the plaintiffs' injuries resulted from repetitive causes, the day-to-day implied refusal to sell to them. Both the cause and the effect continued. Yet there always existed the possibility that Flintkote would change its position. Thus, there was no assurance of the continuation of causal acts beyond any particular day.

Appellees assail the limitation of damage rule on its merits, but we find no compelling reasons for discarding so late in the day such a well-established rule. Not only the need for preserving some semblance of certainty in the law, but also the relatively simple procedural method of averting the time limitation pitfall dictates this result.

The proper procedure to be followed in seeking recovery for injuries caused by acts occurring after the filing of the action is to file a separate suit, as was done in Bordonaro Bros. Theatres v. Paramount Pictures, supra, or a supplemental action, Bigelow v. RKO Radio Pictures, Inc., supra, or as the administration of justice dictates upon the remand of the instant case, by a supplemental complaint.

The absence of any acceptable basis for segregating the damage award makes it unnecessary to consider whether the amended complaint, a superseding pleading, could be employed to sustain an

award through March 23, 1953. Whether it did or did not would not affect our disposition of this issue.

C. *The Covenant Not to Sue, Vis a Vis Damages.*

On July 31, 1953, after the action was filed but before trial, the plaintiffs executed an agreement denominated "Covenant Not to Sue" with certain named co-conspirators other than Flintkote. By the terms of the agreement the plaintiffs agreed to withdraw their action against the covenantees in exchange for the sum of $20,000.00, expressly reserving therein all rights against defendant Flintkote.

The question presented is whether the $20,000 should be subtracted from the actual damages fixed by the jury verdict ($50,000) before said damages are trebled, or whether the award should first be trebled and then the $20,000 deducted from the trebled amount of $150,-000. The former method produces a $90,000 judgment while the latter method results in a $130,000 judgment, or a difference in dollars and cents of $40,-000.00.

The parties stipulated that all facts concerning the amount and effect of said covenant should be withheld from the jury and the question left to the determination of the District judge. He decided that the jury verdict should be trebled and then the aggregate sum diminished by $20,000.

So far as our research reveals, this is a question of first impression for an appellate court.[37] Nevertheless, the resolution of it clearly lies in the application of firmly rooted principles of joint liability and the manifest objectives of the antitrust laws in general and the treble damage provision in particular.

The germane portion of the covenant provides,

"That the sum of Twenty Thousand Dollars ($20,000) paid herein to the covenantors as consideration for the execution of this covenant not to sue does not represent to covenantors and shall not be construed as full compensation for the alleged damages claimed to have been suffered by the covenantors in their original complaint and in their first amended complaint, but is only *partial compensation* therefor, * * *"

The meaning of the italicized words is at best inconclusive. However, two conclusions can by inference be drawn from the document. First, it was not intended to be a release or to constitute full compensation. Second, the precise import of the treble damage statutory provision on the final settlement cannot be ascertained with scientific accuracy, but it can hardly be doubted that the spectre of potential three-fold liability influenced the negotiations.

The treble damage section reads as follows:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

15 U.S.C.A. § 15.

Thus, pursuant to congressional fiat, the jury award is trebled. Here the jury verdict placed the actual damages at $50,000. Superimposing the statutory sanction, the total collective liability for the alleged violation is $150,000.

Flintkote, if a co-conspirator, would be jointly and severally liable under well-settled principles of law for the entire amount if (1) the plaintiffs had successfully prosecuted any or all of the other co-conspirators, or (2) no jurisdiction could be acquired over the other alleged offenders and consequently only Flintkote was sued. Accordingly, the

---

37. However, another District judge in an unreported case. Winekler & Smith Citrus Products Co. v. California Fruit Growers Exchange, decided March 5, 1956, reached the same conclusion as did the court below.

settlement does not impose an additional burden on Flintkote, but rather serves only to militate against its liability. The question is to what extent should it do so?

■ Irrespective of the nature of the cause of action, a plaintiff is entitled to one full satisfaction of his claim in an action against joint defendants.[38] In the case at bar, as it was tried, partly by jury and partly by the court, and assuming there was no error in the introduction of evidence, such satisfaction would not be achieved by the award of any sum, which added to the settlement sum, did not total $150,-000.

■■ We are told that the treble damage provision is a unique statutory penalty, and therefore the pro tanto reduction should be made from the compensatory verdict itself. The non-compensatory share of the award is akin to the award of exemplary or punitive damages. In the case of punitive damages joint tortfeasors are liable for the entire amount, not merely the compensatory part.[39] Further, a niggardly construction of the treble damage provisions would do violence to the clear intent of Congress. The private antitrust action is an important and effective method of combatting unlawful and destructive business practices. The private suitor complements the Government in enforcing the antitrust laws. The treble damage provision was designed to foster and stimulate the interest of private persons in maintaining a free and competitive economy.[40] Its efficacy should not be weakened by judicial construction.

Moreover, a contrary result would put a premium on litigation and discourage settlements. It is not the policy of the law to encourage litigation at the expense of compromise.

■ The collective liability for the alleged conspiracy as found at this trial, was $150,000. If no error had been committed, this is the amount which plaintiffs should have received. The plaintiffs having already received $20,000, it was proper to deduct that sum from the trebled amount. Any other method would have resulted in plaintiffs receiving less than the whole to which they were entitled.

D. *Attorney's Fees; Below and On Appeal.*

The holding that there was prejudicial error in this case, requiring reversal, renders unnecessary a consideration of the arguments advanced concerning the propriety of the amount awarded as attorney's fees, and of the sum requested for legal services performed in connection with this appeal. Baush Mach. Tool Co. v. Aluminum Co. of America, supra; Paramount Film Distributing Corp. v. Village Theatre, 10 Cir., 228 F.2d 721.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views expressed in this opinion.

STEPHENS, Circuit Judge (concurring).

I concur with the opinion insofar as it treats of the subject of damages. I express no opinion as to the rulings upon the objections to the evidence.

---

38. Davis v. Lawhon, 186 Ark. 51, 52 S. W.2d 887.

39. Reizenstein. v. Clark, 104 Iowa 287, 73 N.W. 588; Waggoner v. Wyatt, 43 Tex. Civ.App. 75, 94 S.W. 1076. See also, Washington Gas-Light Co. v. Lansden, 172 U.S. 534, 553, 19 S.Ct. 296, 43 L.Ed. 543.

40. Lawlor v. National Screen Service, 349 U.S. 322, 329, 75 S.Ct. 865, 99 L.Ed.

1122; United States v. Borden Co., 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903; United States v. National City Lines, 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584; Karseal Corp. v. Richfield Oil Corp., 9 Cir., 221 F.2d 358; Maltz v. Sax, 7 Cir., 134 F.2d 2; Weinberg v. Sinclair Refining Co., D.C., 48 F.Supp. 203.