**WAYS & MEANS, INC., a corporation, and Labcon, Inc., a corporation, Plaintiffs,**

v.

**IVAC CORPORATION, a corporation, Defendant.**

No. C–76–2017 WHO.

United States District Court, N. D. California.

June 18, 1979.

Jerrold N. Offstein, John H. Boone, Boone, Schatzel, Hamrick & Knudsen, San Francisco, Cal., for plaintiffs.

Richard J. Archer, Sullivan, Jones & Archer, San Francisco, Cal., MacDonald, Halsted & Laybourne, Los Angeles, Cal., for defendant.

## OPINION

ORRICK, District Judge.

This case tests the propriety of certain marketing devices employed in a relatively new area of the health care industry by defendant, IVAC Corporation ("IVAC"), a Delaware corporation based in San Diego, California, which manufactures and sells electronic thermometers. These instruments, described in more detail below, record human temperatures through use of a temperature-sensitive probe sheathed in a disposable plastic probe cover. Since 1971, IVAC has marketed its thermometer through a program by which hospitals essentially lease, for a monthly fee, a complete temperature-taking system, including thermometers, probe covers, and all other necessary accessories. Throughout the period from 1971 to the present, defendant's thermometers have also been available for purchase or lease outside the program.

Plaintiff Ways & Means, Inc. ("Ways and Means"), a California corporation, manufactures probe covers compatible with IVAC's thermometers, and competes with IVAC in the sale thereof. These products are marketed through plaintiff Labcon, Inc. ("Labcon"), a wholly-owned subsidiary of Ways & Means. In this action, plaintiffs contend that IVAC's marketing program constitutes an unlawful tying arrangement in violation of the Clayton Act, 15 U.S.C. § 14,[1] and that through its use, IVAC has restrained trade and attempted to monopolize the market for probe covers, all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[2] The matter is presently before the Court on cross-motions for summary judg-

1. Section 3 of the Clayton Act provides:

   "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

2. Sections 1 and 2 of the Sherman Act provide:

   "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corpo-

ment. For the reasons hereinafter set forth, the Court, finding there to exist no genuine issue as to any fact material to the disposition of this case, enters judgment for the defendant.

## I.

IVAC first developed its electronic thermometer in 1969. This product is a small, portable unit which utilizes battery-powered subminiature electronic components to provide a digital temperature display. The thermometer is attached by a flexible cord to a temperature-sensitive probe which is enclosed in a plastic probe cover. The disposable plastic probe cover eliminates the need for sterilization between uses, since a separate probe cover is used for each temperature taken. IVAC has obtained a variety of patents on these products.

IVAC began to sell its product in 1970. Initially, a traditional marketing approach was utilized: thermometers were sold outright to hospitals, which paid one price for each thermometer, and separate prices for probe covers and other accessories necessary to operate the system.[3] According to IVAC, this approach met with several objections from hospital administrators, who feared that the units would rapidly become obsolete through new development, who voiced concerns over the ability of nurses to operate the thermometers, and whose capital budgets could not easily accomodate the purchase of such expensive equipment.

In response to these problems, IVAC introduced, in 1971, a new marketing approach called the "Temperature System Program," or "TSP." Under TSP, IVAC provided hospitals with an entire temperature-taking system, including thermometers, probe covers, other accessories, in-service training for hospital personnel, and maintenance. Users agreed to purchase 15,000 probe covers for each thermometer provided, and were billed on a monthly basis. The system was available for one or two-year periods and, for a premium rate, a thirty-day cancellation option was included. Such a program eased the fears of obsolescence, facilitated the introduction of the devices into hospital routine, and, because probe covers were purchased with operating funds, avoided the need for capital outlays in the acquisition of the thermometers.

The TSP program was apparently successful, and has remained in use since its introduction. But although the TSP has been the principal vehicle through which IVAC has marketed electronic thermometers and probe covers, it has never been the *exclusive* means of acquiring either product. Electronic thermometers have also been available for purchase or lease throughout the period in question. Indeed, plaintiffs concede that defendant has never refused to sell thermometers outside the TSP program.[4] And it is clear that since 1971, a substantial percentage—perhaps 25%—of

ration, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 1.

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

3. Although the cost of thermometers has varied, each unit sells for several hundred dollars.

Probe covers, by contrast, market for between $20 and $50 per 1,000 units.

4. One of the few undisputed facts set forth in the parties' Joint Pretrial Statement reads as follows:

"Defendant IVAC has always been willing to sell electronic thermometers to customers whether or not these customers also bought or used IVAC's disposable probe covers."

Moreover, the following response was given by plaintiffs in answer to one of defendant's interrogatories:

INT: "Do plaintiffs contend that defendant has ever refused to sell its electronic thermometers unless the purchaser of such thermometer also agrees to purchase from defendant * * * IVAC's disposable probe covers?

ANSWER: No."

defendant's sales of thermometers have been through the direct sale of units to hospitals, outside the TSP program.[5] Moreover, a small but not insignificant number of units have been leased during the period, apart from TSP.[6]

The complaint was filed on September 20, 1976, alleging in essence that defendant's TSP program constituted a tying arrangement in violation of the Sherman and Clayton Acts, and that defendant had sought to monopolize the probe cover market through utilization of this arrangement. 15 U.S.C. §§ 1, 2, 14. In March, 1978, cross-motions for summary judgment were made. Plaintiffs asserted that, as a matter of law, the undisputed facts disclosed the existence of an unlawful tying arrangement. Defendant urged three grounds for its motion: (1) that because the thermometers and probe covers are separately available to customers, the TSP program cannot be held to be a tying arrangement, *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); (2) that there exists a "crucial relationship" between the thermometers and the probe covers which justifies their sale as a package, *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545 (E.D.Pa.1960); and (3) that plaintiffs failed to produce any evidence from which to infer that they had been injured by the TSP program. These motions were denied on April 21, 1978.

In November, 1978, immediately prior to trial, plaintiffs moved for a ruling on the admissibility of a "damage study" which purported to document the damages they had suffered. At that time, the cross-motions for summary judgment were renewed, and oral argument was heard. The Court found the damage study to be inadmissible for the reasons stated below. Further, having reconsidered its earlier rulings on the cross-motions for summary judgment, the Court now finds summary judgment appropriate based upon the first and third grounds asserted by the defendant, which are discussed *seriatim*.[7]

## II.

### A.

The Supreme Court has condemned illegal tying arrangements as *per se* violations of the antitrust laws. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (hereinafter cited as *Fortner I*); *Northern Pacific Ry. Co. v. United States*, supra. In *Northern Pacific* and subsequent cases, three elements necessary to constitute an unlawful tie-in have been articulated. First, there must in fact exist a tying scheme by which purchasers are required to buy one commodity or service in order to obtain a second, distinct commodity or service. Second, the seller must possess sufficient economic power in the tying product to enable him to impose significant restrictions in the market for the tied product. Third, a not insubstantial amount of interstate commerce in the tied product must be affected. *Northern Pacific Ry. Co. v. United States*, supra, 356 U.S. at 5–7, 78 S.Ct. at 518–519. *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977). The law views such arrangements harshly, for their

5. Although the precise number of thermometer sales made outside the TSP program may be in dispute, the differences between the parties' positions are immaterial. Plaintiffs calculate, through use of defendant's financial statements, that during the period from 1974 to 1977, 13,842 thermometers (75%) were marketed under TSP, while 4,798 (25%) were sold outright. Russ Affidavit, Exhibit A. Defendant estimates, through less carefully documented means, that over 8,000 thermometers had been sold outright by 1976. Meyer Affidavit. Based upon all the material submitted, the Court finds beyond dispute that the percentage of outright sales is approximately 25% of the total. Moreover, counsel for the plaintiffs stipulated to this figure during oral argument.

6. Documentary evidence submitted by the plaintiffs indicates that during the period from 1974 to 1976, approximately 100 thermometers were leased outside the TSP program. Offstein Affidavit, Exhibit 13.

7. Because the Court finds there to exist genuine issues of fact concerning defendant's allegations with respect to its *Jerrold Electronics* defense, this Opinion shall not concern itself with that ground.

operation may force buyers to forego more desirable alternatives in the tied product, thus foreclosing significant portions of the market in the tied product from competing suppliers. *Fortner I, supra,* 394 U.S. at 498–99, 89 S.Ct. at 1256–1257; *United States v. Loew's Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962).

Plaintiff's reliance upon the defendant's TSP program as an express, contractual tying arrangement cannot succeed, for defendant's overall marketing program does not possess the first element outlined above. In *Northern Pacific,* the Court noted:

> "Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Id.* 356 U.S. at 6, n.4, 78 S.Ct. at 518, n.4.

This proviso merely restates the obvious: if the desirable, tying product is truly available without the condition that other products be purchased with it, its alternative sale as part of a package cannot logically be a device to force the purchase of the "tied" products. Recognizing this, courts continue to require that, in order to succeed upon such a claim, a plaintiff must first demonstrate the actual existence of a tying arrangement. *Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1216; *Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 708 (7th Cir. 1978), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Heatransfer Corp. v. Volkswagenwerk A.G.,* 553 F.2d 964 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

■ In the instant case, it is clear that defendant offered its electronic thermometers for sale or lease outside the TSP program. By undisputed facts set forth in the parties' Joint Pretrial Statement, plaintiffs have conceded that IVAC has always been willing to sell its thermometers whether or not the customer also purchased probe covers. *See* n.4, *supra.* The same admission was made in answers to defendant's interrogatories. In addition, plaintiffs' pleadings and affidavits themselves document the instances in which outright sales and leases of thermometers have taken place. *See* Russ affidavit, Exhibit A; Plaintiffs' Memorandum in Support of Motion for Summary Judgment, at 14. Based upon these established facts, plaintiffs' claim that the TSP program constitutes an explicit tie-in is insufficient as a matter of law.

This does not end the analysis, however, for plaintiffs are correct in their assertion that separate availability will not preclude antitrust liability where a defendant has established its pricing policy in such a way that the only viable economic option is to purchase the tying and tied products in a single package. The Supreme Court recognized the dangers of price tie-ins in *United States v. Loew's Inc., supra,* in which the district court had found movie distributors guilty of conditioning licenses for popular films upon acceptance of a package containing inferior releases. The judgment enjoined the defendants from:

> "Entering into any agreement to sell or license the right to exhibit any feature film over any television station in which the differential between the price or fee for such feature film when sold or licensed alone and the price or fee for the same film when sold or licensed with one or more other film [*sic*] has the effect of conditioning the sale or license of such film upon the sale or license of one or more other films." *Id.* 371 U.S. at 43, 83 S.Ct. at 101.

The Supreme Court affirmed the inclusion of such language in the final relief. *Id.* at 54–55, 83 S.Ct. at 106–107.

Subsequent decisions have acknowledged the importance of policing differential price structures. *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272 (2d Cir. 1967); *Advance Business Systems & Supply Co. v. SCM Corp.,* 287 F.Supp. 143 (D.Md.1968), *aff'd,* 415 F.2d 55 (4th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). In *American Manufacturers,* plaintiff insurance companies complained that the American Broadcasting Company had refused to sell spon-

sorship rights in its evening news program unless purchasers paid for broadcast on the entire network, thus tying sponsorship of less popular local stations to sponsorship of highly desirable stations. In considering the merits of plaintiffs' claim, the court stated the rule as follows:

"As we view the law, where there is no quality or distinguishing desideratum between a product offered singly or in a package, the seller cannot charge substantially higher for the individual product if the price differential has the effect of conditioning the sale of the entire package and if the difference in price cannot be legitimately justified by cost considerations." *Id.* at 283.

In *SCM*, the Fourth Circuit reached the same conclusion. There, defendant, in order to tie up sales of its copy paper, offered copying machines on a "copy service" basis, whereby consumers paid a flat fee per copy, and were provided with an entire duplicating system, including paper, toner, etc. Its highly desireable machines were also available for sale, but at a price far in excess of the cost of the "copy service" plan. The

8. During oral argument on December 27, 1978, plaintiffs suggested, for the first time during the litigation, that the 25% non-TSP purchasers *might* represent a special class of high-volume users (i. e., hospitals with exceptional temperature-taking needs), differentiable from other customers. This kind of eleventh-hour assertion, unsupported by any facts in the record, is hardly sufficient to demonstrate the existence of a genuine issue of material fact.

9. The parties have each attempted to set forth figures comparing the costs of procuring temperature-taking systems under various alternatives. *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 6–9. First Affidavit of Weill, at 2–3. These attempts disclose that the basic prices for various components of the system are undisputed, and can be gleaned from price lists submitted as exhibits. Offstein Affidavit, Exhibit 9; Defendant's Exhibit 1066A. Using prices in effect during 1974, the following simple data can be generated:

ANNUAL COST OF SINGLE THERMOMETER
WITH 15,000 PROBE COVERS

| | TSP | Purchase of Thermometer and Probe Covers from Defendant | Purchase of Thermometer from Defendant, Probe Covers from Plaintiffs |
|---|---|---|---|
| One year | $670 | 786* | 561* |

court denounced the arrangement, holding that

"[tie-ins] are non-coercive, and therefore legal, only if the components are separately available to the customer on a basis as favorable to the tie-in arrangement." *Advance Business Systems & Supply Co. v. SCM Corp., supra*, 415 F.2d at 62.

Cognizant of these principles, the Court nevertheless concludes that plaintiffs have failed to produce sufficient evidence from which any inference of unfairness can be drawn with respect to defendant's pricing policy. Most glaring is the undisputed fact that approximately 25% of all purchases of electronic thermometers were made outside the TSP program.[8] This fact suggests that, *a fortiori*, separate purchase of thermometers and probe covers was a reasonable alternative. Moreover, as set forth in greater detail in the margin,[9] under no view of the facts can it be said that defendant's price differentials render the TSP program the sole viable option for purchasers. Hospitals

ANNUAL COST OF SINGLE THERMOMETER
WITH 15,000 PROBE COVERS

| | TSP | Purchase of Thermometer and Probe Covers from Defendant | Purchase of Thermometer from Defendant, Probe Covers from Plaintiffs |
|---|---|---|---|
| One year (with 30-day cancellation clause) | 720 | --- | --- |
| Two years | 630 | 786 | 561 |
| Three years | 590 | 786 | 561 |

*(The purchase figure for one electronic thermometer is determined by depreciating the total cost of $555 over a five-year period, a conservative estimate of the instrument's useful life. The price of IVAC probe covers is computed at $45 per 1,000 units. The price of plaintiffs' probe covers is computed at $30 per 1,000 units.)

As the table graphically illustrates, a customer wishing to economize would purchase a thermometer from defendant and probe covers from plaintiffs—this is the least expensive arrangement. Were defendant attempting to create a tying situation through pricing policy, the purchase price of the tying product—electronic thermometers—would be established at a figure so high that cost savings via separate purchases would not be possible.

wishing to purchase defendant's thermometers outside the TSP program could not only do so, but could accomplish such a result *at a lower price than possible through the TSP program.* A defendant engaged in establishing a tying arrangement could not permit this to occur. Under this set of circumstances, no trier of fact could correctly conclude that an implicit tying arrangement existed by virtue of price manipulation.

Plaintiffs' reliance upon *SCM* does not alter the result here. In that case, the outlines of which are set forth above, the court merely refused to accept separate availability as a complete defense to allegations of tying. Examining the particulars of defendant's pricing policy, the court found that "[purchase] of a copying machine for $4250 * * * is clearly not the economic equivalent of rental at a charge of approximately $.035 per copy." *Advance Business Systems & Supply Co. v. SCM Corp., supra,* 415 F.2d at 62. In addition, extremely few sales of the copiers had actually been made—none within the relevant geographical market—and the machines were not available on a lease basis outside the tying arrangement. *Id.,* 287 F.Supp. at 152, 156. Finally, such economic coercion was accompanied by less subtle means of persuasion, including misrepresentations as to competing products, industrial sabotage, and refusals to deal. No such allegations have been made in the instant case.

The Court thus finds that, as a matter of law, defendant's TSP program does not constitute an illegal tying arrangement in violation of the Clayton or Sherman Acts, 15 U.S.C. §§ 1, 2, 14. The undisputed facts demonstrate that there does not exist a tie-in of two products by which the sale of one is conditioned upon acceptance of the other.

**B.**

■ It is well-established in this circuit, as elsewhere, that Sherman and Clayton Act recovery is only available "where actual injury has been suffered." *Gray v. Shell Oil Co.,* 469 F.2d 742, 749 (9th Cir. 1972); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir. 1971). Plaintiffs rest their claim of actual injury on two proffered items of evidence: (1) a "damage study" prepared specifically for use at trial; and (2) the testimony of Thomas W. Van Ryne, III, a marketing officer for plaintiff Labcon, to the effect that plaintiffs' failure to sell probe covers in greater quantities was the result of defendant's marketing techniques. Having thoroughly examined the damage study and the supporting affidavits and exhibits, the Court now denies plaintiffs' motion for a pretrial ruling of admissibility, and finds the study inadmissible as evidence pursuant to Rule 703 of the Federal Rules of Evidence. This leaves only the testimony of Van Ryne, which is clearly insufficient to establish the existence of a genuine issue of material fact as to damages.

■ The damage study was prepared for plaintiffs by C. Michael Davie, a medical research economist at SRI International in Menlo Park, California. At the time he conducted the study, Davie had served in that position for slightly less than a year, having had previous experience in the areas of sales, market research, product evaluation and planning in the medical products field. Davie has degrees in psychology, biology, and business administration.

The study itself is composed of two elements. The first is a "Summary of Responses" to a telephone survey conducted by Davie among 25 of defendant's 1,750 TSP customers. Davie Affidavit, Exhibit B. This survey, which was performed by propounding the questions set forth in Exhibit A to the Davie Affidavit, explores the openness of IVAC's TSP customers to alternative manufacturers of probe covers, as well as the effect of defendant's TSP program on the probe cover market generally. The second element of the study attempts to calculate defendant's market shares in the thermometer and probe cover markets, projected sales growth for IVAC through 1985, and hypothetical market shares for plaintiffs under varying assumptions. Davie Affidavit, Exhibits C–G. This portion of the study was prepared with information obtained from defendant's price lists and market reports, similar information prepared by competitors, and general health industry data.

Rule 703 of the Federal Rules of Evidence provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

The Advisory Committee Notes, 51 F.R.D. 404 (1971) make clear that one purpose of the rule was to facilitate the use at trial of polls and surveys:

"The rule also offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence. Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved."

The modern trend appears to be to examine the admissibility of survey evidence without regard to traditional hearsay analysis, relying instead upon the two principal factors suggested by Rule 703: (1) whether or not there is some *necessity* that makes the survey desirable; and (2) whether or not the survey itself is *trustworthy*. 1 J. Moore, Federal Practice ¶ 2.71 (2d ed. 1974); *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670 (S.D.N.Y.1963).

It appears that plaintiffs could easily meet the necessity requirement, for assuming that the amenability of IVAC's TSP customers to plaintiffs' products is relevant to damages, plaintiffs can scarcely be expected to canvass all 1,750 TSP customers; accordingly, some survey sampling is certainly in order. However, as to the trustworthiness of the study, plaintiffs encounter more difficulty. On this issue, Professor Moore has provided a helpful standard:

"The offeror has the burden of establishing that a proffered poll was conducted in accordance with accepted principles of survey research, i. e., that the proper universe was examined, that a representative sample was drawn from that universe, and that the mode of questioning the interviewees was correct. He should be required to show that: the persons conducting the survey were recognized experts; the data gathered was accurately reported; and the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys. Normally this showing will be made through the testimony of the persons responsible for the various parts of the survey." 1 J. Moore, Federal Practice ¶ 2.71 (footnote omitted).

The leading case of *Zippo Manufacturing Co. v. Rogers Imports, Inc., supra*, is illustrative. There, plaintiff in a trademark infringement case attempted to demonstrate consumer confusion through use of a survey. The expert conducting the survey testified extensively as to "the principles and procedures by which surveys were conceived and conducted," including: (1) the various drafts through which survey questions were perfected, (2) the detailed manner in which the sample survey was arrived at, and (3) the actual conduct of the survey itself. The original responses to the questions were made available to the defendant. In addition, plaintiff produced a second witness, expert in the field of "survey research," who testified that "the project was conducted objectively and scientifically." With this as foundation, Judge Feinberg admitted the survey into evidence.

Plaintiffs' damage study does not measure up to these standards, for a variety of reasons.[10] As a preliminary matter, the relevance of the study is questionable. The entire thrust is directed to showing *future* potential earnings by plaintiffs in the absence of a TSP program. It is extremely unclear what bearing such projections have on the issue of actual losses sustained dur-

10. Several, though not all, of the objections which follow in the text might have been cured by the Supplemental Affidavit of C. Michael Davie. However, that document was filed on December 27, 1978, the very day set for oral argument, and hence did not enter into the Court's consideration of this case.

ing the period in which IVAC was imposing the alleged tying arrangement.

In addition, no testimony has been proffered which bears on the critical standard of Rule 703: whether or not such a survey is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." In *Zippo*, this was done through the testimony of an independent expert who did not participate in the survey itself. There is little to suggest that Mr. Davie, though a "medical research economist," has sufficient expertise in the preparation and administration of surveys. His qualifications include "surveys and evaluations of new and existing medical products and inventions"— but this does not suggest any degree of sophistication in opinion polling of the kind utilized here. Furthermore, although Mr. Davie indicates that the Questionnaire was prepared "in consultation with other members of the staff at SRI International," no further identification or qualifications are given.

Moreover, very little has been proffered in terms of the specific procedures utilized in conducting the survey. The Court is informed only that the hospitals contacted were selected using "a standard table of random numbers." Nothing is said about the sufficiency of the *size* of the sample (25 customers out of 1,750), the manner in which the questionnaire was developed, or the mode of questioning (for example, certain of the questions propounded in the questionnaire appear to be extremely suggestive). Nor is the significance of the 20% sampling error discussed. As well, the survey results appear to contain internal inconsistencies which render them confusing. For example, Exhibit B indicates that while only 14 of 22 IVAC customers surveyed said they would be willing to evaluate less expensive probe covers, the breakdown of responses by price level category suggests that all 22 responded in the affirmative.

Finally, there appear to be several problems with the market share data contained in Exhibits C–G. Source material is unclear for many of the exhibits (for example,

Davie refers to "various literature sources, including medical and surgical books"), development of IVAC market share figures is not clear, it is not specified whether or not IVAC future sales projections were tested against historical sales data, and no historical periods are provided by which to date most of the exhibits.

For all of the above reasons, the Court finds insufficient foundation upon which to admit the study and, accordingly, it is excluded.

■ The Court now turns to the question of whether or not, in the absence of plaintiffs' "damage study," there is any evidence whatsoever by which plaintiffs can demonstrate injury and damages. The Ninth Circuit has prescribed the following formula for making such a determination:

"We take it that the controlling rule today in seeking damages for loss of profits in antitrust cases is that the plaintiff is required to establish with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue. Once that has been accomplished, the jury will be permitted to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' *Bigelow v. RKO Radio Pictures, Inc.*, supra, 327 U.S. [251] at page 264, 66 S.Ct. [574] at page 580 [90 L.Ed. 652]. The cases have drawn a distinction between the quantum of proof necessary to show the *fact* as distinguished from the *amount* of damage; the burden as to the former is the more stringent one. In other words, the *fact* of injury must first be shown before the jury is allowed to estimate the *amount* of damage." *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957).

*Accord, Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976). Hence, there appear to be two requisites to a successful showing by plaintiffs: (1) a showing of *actual injury* resulting from the unlawful actions of the defendant; and (2) production of "relevant data" from which a jury

can make a "just and reasonable estimate of the damages." Based upon all the evidence proffered to date, plaintiffs have failed to establish the existence of genuine issues of fact bearing upon these standards.

■ With respect to the requisite showing of the *fact* of injury, the cases are uniform in requiring that some actual injury be shown. *Id.* at 811; *Gray v. Shell Oil Co., supra; Wolfe v. National Lead Co.,* 225 F.2d 427 (9th Cir. 1955). Typically, this requires some demonstration of lost revenues or profits, *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 555 F.2d 687 (9th Cir. 1977); *Greyhound Computer Corp. v. IBM Corp.,* 559 F.2d 488 (9th Cir. 1977), or a showing of an increase in prices paid for goods purchased. *Gray v. Shell Oil Co., supra; Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir. 1964). Here, even were plaintiffs to establish the existence of a tie-in, there is no competent evidence whatsoever from which actual injury could be found. Nothing has been presented to demonstrate shrinking revenues or profits, nor have plaintiffs proffered any facts from which it could be inferred that, absent TSP, Labcon probe covers would have captured a greater share of the market. In this regard, the testimony of Van Ryne, standing alone, is far too slender a reed upon which to base genuine issues of material fact.

Plaintiffs vigorously contend, relying upon *Richfield Oil Corp. v. Karseal Corp.,* 271 F.2d 709 (9th Cir. 1959), that once defendant has been found guilty of unlawful conduct, the fact of injury must be *inferred* as a matter of law. The Court does not read *Karseal* so generously. There, plaintiff alleges that defendant oil company, in its relationship with its dealers, had tied the sale of automotive accessories to the sale of gasoline. There was evidence that defendant's sales representatives had told dealers not to trade in plaintiff's products, to remove inventory from shelves, and had made

other threats. Without much elaboration, the court concluded that "it seems patent that the restraint applied would result in some loss of business." *Id.* at 713. However, the issue in *Karseal* was apparently not whether injury had been demonstrated, but whether the proven injury had been causally linked to defendant's misconduct. Indeed, the court assumed that injury had in fact been proven:

> "Richfield concedes that once Karseal had shown that the defendant had violated the antitrust laws, *and the further fact that Karseal actually suffered damage to its business or property,* the jury was permitted to make a just and reasonable estimate of plaintiff's damages." *Id.* at 713.

Moreover, the proven misconduct in *Karseal* far exceeds anything alleged to have occurred in the instant case.

Plaintiffs fall even farther short in their attempt to muster "relevant data" from which a "just and reasonable estimate" can be made. Recognizing the traditional liberality in this area,[11] the Court nevertheless concludes that, in the absence of their "damage study," plaintiffs have made no showing which can survive summary disposition. The Ninth Circuit has identified several routes by which plaintiffs' burden may be met:

> "There are three chief types of evidence which the decisions have approved as the basis for the award of damages. (1) Business records of the plaintiff or his predecessor before the conspiracy arose. (2) Business records of comparative but unrestrained enterprises during the particular period in question. (3) Expert opinion based on items (1) or (2)." *Flintkote Co. v. Lysfjord, supra,* 246 F.2d at 392 (footnotes omitted).

For example, in *Karseal,* plaintiff prevailed by showing that, on the open market, his

---

11. Characteristic of judicial attitudes is the following statement in *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265–66, 66 S.Ct. 574, 580–581, 90 L.Ed. 652 (1946);

" 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights."

product outsold defendant's by a 3 to 1 margin. By demonstrating the quantity of defendant's product sold by gas dealers who had been foreclosed from selling plaintiff's, plaintiff was held to have provided the jury with the requisite factual basis. *Richfield Oil Corp. v. Karseal Corp., supra,* 271 F.2d at 714. Similar showings have carried the day in other cases. *See Mt. Hood Stages, Inc. v. Greyhound, supra* (plaintiff presented evidence of profits prior to defendant's antitrust violation, as well as data concerning historical passenger patterns); *Lessig v. Tidewater Oil Co., supra* (in action by dealer against oil company which had allegedly tied expensive accessories to gas purchases, plaintiff showed difference in price paid under tying arrangement and market price); *Greyhound Computer Corp. v. IBM Corp., supra* (plaintiff used prior history to estimate profits lost when defendant terminated sales of computers to plaintiff).

In contrast, the Ninth Circuit has denied recovery when the factual basis from which to compute damages was lacking. In *Flintkote*, plaintiffs sought lost profits which they claimed resulted from defendant's refusal to sell them building materials necessary to their business. The sole evidence of injury was plaintiffs' testimony as to their own expectations of profits, based upon prior endeavors in other businesses. They admitted to having little managerial experience or knowledge about the business in which they sought to enter. Noting the absence of any evidence concerning comparable businesses, or earlier profits of this business, the court found such evidence insufficient to support a jury verdict. *Flintkote v. Lysfjord, supra,* 246 F.2d at 393–94. *See Gray v. Shell Oil Co., supra.*

The Court finds plaintiffs' showing similarly deficient. Despite a two-year period in which to garner the facts, plaintiffs propose to offer no evidence of sales data from the period prior to the introduction of TSP, no evidence of sales data from comparable markets in other products, and no information concerning competition in the sale of probe covers to the federal government (an area in which the parties apparently compete). In the absence of any basis for mak-

ing a reasonable estimate, the Court must render summary judgment for defendant and against plaintiffs.

Accordingly, defendant's motion for summary judgment is GRANTED, and plaintiffs' motion for summary judgment is DENIED. Defendant will lodge with the Court a form of judgment on or before June 29, 1979.